THE COUNTY COMMISSIONERS OF BALTIMORE COUNTY
*vs.* THE BOARD OF MANAGERS OF THE MARYLAND
HOSPITAL FOR THE INSANE.

*Maryland Hospital for the Insane—State property—Assessment—Construction of the Acts of 1876, chs. 101 and 351, and 1878, ch. 341, sec. 13.*

The property on which the Maryland Hospital for the Insane is situated, and which by the Acts of 1876, ch. 351, and 1878, ch. 341, sec. 13, was placed under the direction and control of a Board of Managers as a corporate body, under the name of the Board of Managers of the Maryland Hospital for the Insane, belongs to the State, and said corporation is not liable to assessment for the cost of opening a public road contiguous to said property.

Such assessment is not authorized by the Act of 1876, ch. 101, providing for the completion of Wilkins Avenue, a public road, and which appointed a board of examiners and assessors "for the purpose of making such assessments *upon the owners* of lands lying on or near Wilkins Avenue for the construction and completion thereof, as in their judgment may be benefited by the construction and completion of the same."

This Act was not intended to authorize an assessment against the State in respect to property owned by it.

The placing the Hospital property under the direction and control of a Board of Managers, merely constituted them "Managers" of the property, and did not divest the State of its proprietary rights.

APPEAL from the Circuit Court for Carroll County.

The appellant sued the appellee in the Circuit Court for Baltimore County to recover the amount assessed upon the defendant for the construction of Wilkins avenue, a public road, contiguous to the property of the defendant. The cause was removed to the Circuit Court for Carroll County, and there tried before the Court upon an agreed

statement of facts which are sufficiently set forth in the opinion of this Court. The Court (SMITH and JONES, J.) found a verdict in favor of the defendant, and judgment was entered accordingly. The plaintiff appealed.

The cause was argued before ALVEY, C. J., STONE, IRVING, and RITCHIE, J.

*D. G. McIntosh*, and *R. R. Boarman*, for the appellant.

*James A. Buchanan*, for the appellee.

RITCHIE, J., delivered the opinion of the Court.

By the Act of 1876, chap. 101, providing for the completion of Wilkins avenue, a public road of Baltimore county, a board of examiners and assessors was appointed "for the purpose of making such assessments upon the owners of lands lying on or near Wilkins avenue, for the construction and completion thereof as in their judgment may be benefited by the construction and completion of the same." In the execution of their duties under this Act in the mode therein provided, said Board assessed against the defendant the sum of $1550 for land, on which the Maryland Hospital for the Insane is situated, held by it under the provisions of the Act of 1876, ch. 351, and the Act of 1878, ch. 341. By section 5 of the Act of 1876, ch. 101, it is enacted that if any person or persons or body corporate, shall feel aggrieved by the award of said board, objections may be filed with the County Commissioners, and that from the final order of ratification or rejection by the Commissioners, any person interested in the proceedings may appeal to the Circuit Court for Baltimore County. The assessment made was ratified, and no point has been made as to the mere regularity of the proceedings.

The sole question submitted to the Court below was whether the land as held by the defendant corporation is

legally liable to said assessment; and it is only this question, on the appeal from the judgment in favor of the defendant, we have to pass upon.

If the land to be affected by the assessment is the property of the State used in carrying out one of the objects or functions of the State Government, we do not think it liable to the assessment; unless the power so to subject it has been clearly conferred in the said Act of 1876, ch. 101, or it has been made so liable from the rights and powers conferred on the defendant, or the nature of its control over the property, under the Acts of 1876, ch. 351, and 1878, ch. 341.

The principle underlying this proposition is thus expressed in 2 *Dillon on Mun. Corp.*, (*3rd Ed.*) *sec.* 773 : "The general statutes of the State upon the subject of taxing property undoubtedly *refer to private property* and not to that owned by the State ; and in view of the public nature of municipalities, and the purposes for which they are established, heretofore explained, the author is of opinion that such enactments do not by *implication* extend to any property owned by them—certainly to none owned by them for public uses. On this ground it was held that a sale of lands, the property of a city corporation, and constituting part of the *city cemetery*, for taxes, was void. But the sound principle is, that property owned by a State, or by the United States, or by a municipality for public uses, is not subject to be taxed, unless so provided by positive legislation."

By the Act of 1876, ch. 263, the Legislature appropriated one hundred and thirty-five thousand dollars to be applied in payment of the mortgage indebtedness to which said property had been subjected by the "President and Visitors of the Maryland Hospital," and to provide furniture for the hospital ; but upon the express condition, subsequently complied with, that " the Maryland Hospital, and all the lands, together with all the rights, privileges

and appurtenance thereto belonging, shall be conveyed to the State of Maryland free, clear and discharged of all incumbrances, by a good and sufficient deed in fee."

By section 1 of the Act of 1876, ch. 351, it is enacted, that the Governor by and with the advice and consent of the Senate, shall appoint nine persons managers of the Maryland Hospital for the Insane, who shall serve without pay, and hold their offices for certain stated terms; their successors to be appointed by the Governor, &c., who shall hold their offices for six years and until others are appointed in their stead.

By section 2 the President and Visitors of the Maryland Hospital are authorized and directed to "transfer by deed all the real estate and other property belonging to said trust, which may be in their possession, to the Managers of the Maryland Hospital for the Insane, above provided for, and the government of the State Hospital for the Insane shall be vested in the said Board of Managers."

Section 3 provides: "The said Board of Managers shall have the general direction and control of all the property and concerns of the said hospital, and shall take charge of its general interests, and see that its great design is carried into effect, and everything done faithfully according to the requirements of the Legislature and the bylaws, rules and regulations of the said hospital; but shall have no authority or power to mortgage or pledge any of the property, real or personal, of said hospital." Following this section were several others relating to the appointment of physicians, nurses, &c., and other duties pertaining to the management of the hospital. Section 7 authorizes the Board to take and hold in trust for the State, any grant or devise of land, or any donation or bequest, to be applied to the maintenance of insane persons and to the use of the hospital. Section 9 requires the managers to provide accommodation for at least two hundred and fifty pauper lunatics, which number shall be apportioned

among the several counties and the City of Baltimore. Section 10 empowers them to receive other insane persons as pay patients, to a number not exceeding seventy-five at any one time. Section 11 authorizes the Courts therein mentioned, to send from time to time to the said hospital, as the counties and Baltimore City may be entitled, the pauper lunatics provided for in the ninth section. Section 12 appropriates from the treasury fifteen thousand dollars annually "for the support of said hospital."

In the Act of 1878, ch. 341, section 13, enacts as follows: " That the Hospital for the Insane, which was heretofore located and built on its present site, at or near Catonsville, in Baltimore County, in this State, by and under the authority of the laws of this State, and which is now under the general direction and control of the Managers of the Maryland Hospital for the Insane, is hereby declared to have been built and established on its said site by the authority and direction of this State ; the Board of Managers of the Maryland Hospital for the Insane, are a body politic and corporate by the name of the Board of Managers of the Maryland Hospital for the Insane, and shall by that name have perpetual succession; may sue and be sued in any Court of this State, and may have and use a common seal, and may at their pleasure alter and change the same ; the said corporation shall have and exercise all the rights and powers heretofore vested in the Board of Managers of the Maryland Hospital for the Insane ; the said Board of Managers of the Maryland Hospital for the Insane, as such corporation is hereby declared to be a public agency of this State, for the administration of one of the charities thereof; and the hospital aforesaid, located as aforesaid, is hereby declared to be one of the means adopted by this State for the administration of one of its public charities."

These declarations of the proprietorship of the State in the hospital property; of the hospital being an established

institution for carrying on one of the most needed, and, so to speak, incumbent charities of the State; and that the said Board of Managers is but a public agency of the State, for the administration of this particular charity—so plainly and emphatically expressed—leave no room to doubt what is the legislative understanding of the State's relations to the property, and to the means employed to accomplish its purpose. And the recital of the legislation embodied in the Acts to which we have so fully referred, shows those declarations to be but expressive of its obvious construction.

It seems manifest that the "Managers" are what the term imports—*Managers* simply of the property, with no power to pledge, alienate or encumber it; charged with the duty of its protection and faithful operation for and on behalf of the State, but invested with no absolute ownership of the property. Their corporate form was adopted by the State only more conveniently and efficiently to administer the affairs of the institution connected with "its great design,"—The cure of the insane, especially those unable to defray the expense of curative treatment. In reference only to their qualified control of the property, such as seeing to its preservation from trespass, or from falling into decay; providing for the compensation of necessary officials and employés; furnishing supplies and medicines for the inmates, is their power "to sue or be sued," to be understood; and not that this capacity, essential within its proper range, was meant to comprehend a direct or indirect ability to subject the land or property to possible execution. Guided by the principle, that to bind the land of the State in a way that may divest it from the State, or destroy or impair one of its established agencies or means for carrying on its functions, the Legislature must unequivocally give its sanction; we see no evidence of such expressed or clearly implied intent in the Act of 1876, ch. 101. It is not material whether the State's

property may be taken from it by a tax in the nature of assessment for benefits or in some other way.  The danger exists of taking that which belongs to and is essential to the State; and it cannot be exposed to this danger without its direct sanction.  The phraseology of the Act on which this suit is sought to be maintained, is that common and appropriate to legislation designed to affect private property only.  The word "owner" is used interchangeably with the word "person;" and it is not to be supposed that the State would refer to itself by such designations, if meaning to subject its own property to the operation of the Act.  The question at issue being one of the intent of the Legislature, it cannot be successfully contended that the State meant to become a party litigant before the county commissioners, or the Circuit Court, under the description of "any person aggrieved;" nor to subject its property to a lien and execution on failure to pay the assessment, as is provided in case of default in section 6 of said Act.  Plain and apt words to subject the property of the State to such a process cannot be found in our opinion in the Act in question, which by fair and reasonable construction can be held to apply to the case only of such private parties or bodies corporate as owned their property, and whose property would be benefited by an improvement confessedly local.

It is always to be presumed that the State, while from public policy not permitting itself to be sued, without its express permission, will always deal justly with its citizens, and that it will by an appropriation through the Legislature meet any just claim upon its consideration.

The point decided in the case of the *Mayor and City Council, &c. vs. Greenmount Cemetery,* 7 *Md.,* 517, was that the exemption of its charter "from all taxes," meant taxes for revenue, and not local assessments for local benefits, although the Court recognizes such assessments as taxes, though of a special nature.  Moreover, the prop-

County Comm'rs of Balto. Co. *vs.* Board, &c., of Md. Hospital, &c.

erty of the cemetery did not belong to the State. We think the appellant cannot rely upon that authority as applicable to the present case.

In the case of *Boston Seamen's Friend Society vs. Boston*, 116 *Mass.*, 181, the decision was in accord with that in 7 *Md.*, that the exemption of real estate of charitable institutions from taxation, means only from taxation for the general purposes of government, and does not extend to taxation for local improvements. But while so holding, in the next case in the same volume, *p.* 193, *Inhabitants of Worcester County vs. Mayor and Aldermen of Worcester*, the grounds upon which we base our view of this case, were applied to the case of county property. The principles relied on in that decision apply with even more force where the property of the State is directly involved.

In *St. Louis, Jackson and Chicago R. R. Co. vs. Trustees of the Illinois Institution for Education of the Blind*, 43 *Ill.*, 303, it is held that although the language of a statute may be sufficiently comprehensive to embrace any property owned by the State, still it will not be construed to include property used by the State for a specific purpose; that in such a case it cannot be inferred that such was the intention of the Legislature, and statutes must be construed according to the intention of the body enacting them. A charter had been granted the company to construct a railroad, in which it was provided with reference to its need of land, materials, &c.: "All such land, materials and privileges belonging to the State are hereby granted to said corporation for said purposes." Of like import are *Mayor of Atlanta vs. Central Railroad Co.*, 53 *Georgia*, 120; *In re Boston and Albany R. R. Co.*, 53 *N. Y.*, 574; *Boston Water Power Co. vs. B. & W. R. R. Co.*, 23 *Pick.*, 369; *In re Application of City of Buffalo*, 68 *N. Y.*, 167; *Milwaukee and St. Paul R. R. Co. vs. City of Faribault*, 23 *Minn.*, 167.

*Judgment affirmed.*