MAYOR AND CITY COUNCIL OF BALTIMORE ET AL.
*v.* STATE OF MARYLAND

\* \* \*

CONCERNED CITIZENS OF EAST BALTIMORE
ET AL. *v.* STATE BOARD OF PUBLIC
WORKS ET AL.

[No. 52, September Term, 1977.]

*Per Curiam Order July 15, 1977.*

*Opinion Filed October 25, 1977.*

## PER CURIAM ORDER

For reasons to be stated in an opinion to be filed later, it is this 15th day of July, 1977

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the order of the Baltimore City Court in *State of Maryland v. Mayor and City Council of Baltimore et al.*, filed June 16, 1977 and the decree of the Circuit Court of Baltimore City in *John W. Douglass et al. v. State Board of Public Works et al.*, filed June 16, 1977 be, and they are hereby, affirmed with costs; and it is further

ORDERED that the mandate be issued forthwith.

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Richard M. Hartman, Chief City Solicitor,* and *Joseph S. Matricciani, Assistant Solicitor,* with whom was *Benjamin L. Brown, City Solicitor,* on the brief, for Mayor and City Council of Baltimore; by *Richard V. Falcon* and *William H. Murphy* for Concerned Citizens of East Baltimore et al.; and by *Michael Lewis Freilich* for John W. Douglass et al., appellants.

*David H. Feldman, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, George A.*

*Nilson, Deputy Attorney General, James G. Klair* and *Robert A. Zarnoch, Assistant Attorneys General,* on the brief, for appellees.

ELDRIDGE, J., delivered the opinion of the Court.

This case concerns a variety of issues raised in connection with the State's acquisition and proposed conversion of certain property in Baltimore City for use as a correctional institution.

In the summer of 1976, due to serious overcrowding in the State's prisons, an inter-agency committee was formed to examine various sites in the Baltimore metropolitan area for use as a State correctional institution. The committee included members of the Departments of State Planning, Public Safety and Correctional Services, and General Services, the Governor's Commission on Law Enforcement and the Administration of Justice, and the Governor's Office. This inter-agency committee, after reviewing a substantial number of sites, recommended property at 3500 Biddle Street in Baltimore City, formerly the site of the Continental Can Company. Subsequently, the Board of Public Works authorized the Governor's Chief Legislative Officer to conduct preliminary negotiations with the owners of the site. The result of these negotiations was a lease agreement which was ultimately approved and executed by the Board of Public Works. The lease was expressly contingent upon the appropriation of necessary funds by the General Assembly at its 1977 session.

In January 1977, Senate Bill 278, being the proposed General Construction Loan of 1977, and, *inter alia,* authorizing the acquisition of the Continental Can site, was introduced in the General Assembly. Prior to consideration of the bill, the State Department of Public Safety and Correctional Services prepared and distributed to the General Assembly an Environmental Assessments form which purported to satisfy the requirements of the Maryland Environmental Policy Act. According to the Senate Journal, the General Construction Loan was passed by the General Assembly on April 11, 1977, which was the

last day of the legislative session. The bill was later signed into law by the Governor as Ch. 671 of the Acts of 1977.

On May 18, 1977, the State of Maryland initiated a suit in the Baltimore City Court against the Mayor and City Council of Baltimore and several city officials, seeking a declaration that the City's zoning, building, fire, or similar codes could not be enforced against the State's proposed use of the Continental Can site. Other issues were subsequently raised in this case. On the same day, John Douglass, a member of the House of Delegates, and certain residents of East Baltimore initiated a suit in the Circuit Court for Baltimore City against various state officials, challenging the validity of Ch. 671 of the Acts of 1977 and raising other issues. On June 13, 1977, the Concerned Citizens of East Baltimore were allowed to intervene as defendants in the suit by the State and as plaintiffs in the action by Delegate Douglass and others. Thereafter, motions for summary judgment by the State and the several state officials were granted, resolving all of the numerous issues raised in favor of the State and the state officials.

Appeals were taken to the Court of Special Appeals, and this Court granted petitions and a cross-petition for writs of certiorari prior to any proceedings in the Court of Special Appeals. After the filing of briefs and oral argument, we filed a per curiam order on July 15, 1977, affirming the judgments below. We now set forth the reasons for our order.

(1)

Initially, Baltimore City maintains that the State is bound to comply with the City's zoning ordinance when building a public works project in Baltimore City. Until the City's zoning ordinance was amended by Ordinance No. 272, a correctional institution in Baltimore City was a conditional use, and required the approval of the Board of Municipal and Zoning Appeals. Baltimore City Ordinance No. 272, approved February 16, 1977, now provides that a correctional institution must be approved by an ordinance of the Mayor and City Council of Baltimore. Thus, the City

contends that the State must procure an ordinance of approval from the Mayor and City Council of Baltimore before proceeding with its plans to convert the Continental Can site into a correctional institution.

Baltimore City derives its zoning power solely from the Zoning Enabling Act, Maryland Code (1957, 1970 Repl. Vol.), Art. 66B, § 2.01 *et seq.*, and therefore it must act in the manner prescribed by the Act. *Baltimore v. Swartz*, 268 Md. 79, 91, 299 A. 2d 828 (1973). The City maintains that subjecting the State to local governmental zoning powers is consistent with the terms of the Enabling Act, pointing out that the Enabling Act does not specifically exempt the State from the City's zoning power. Then, the City relies on Art. 66B, § 2.11, which states:

> "Wherever the regulations made under authority of this article require . . . or impose other higher standards than are required in any other statute or local ordinance or regulation, the provisions of the regulations made under authority of this article shall govern."

The City argues that Ch. 671, which appropriates funds for the State's acquisition of the Continental Can property, does not impose higher standards than those contained in Baltimore City's Zoning Ordinance, and that, consequently, the State is subject to the local zoning ordinance.

We disagree. Article 66B, § 2.01 *et seq.*, which grants Baltimore City its zoning authority, neither specifically provides nor clearly implies that the State is intended to be subject to its provisions. In this regard, it is a basic and long-standing principle of statutory construction that the State is not deemed to be bound by an enactment of the General Assembly unless the enactment specifically names the State or manifests a clear and indisputable intention that the State is to be bound. In *State v. Milburn*, 9 Gill 105, 118 (1850), this Court, quoting Mr. Justice Story, stated:

> " 'General Acts of the Legislature are meant to regulate and direct the acts and rights of citizens,

and in most cases, the reasoning applicable to them applies with very different, and often contrary force, to the government itself. It appears to me, therefore, to be a safe rule, founded in the principles of the common law, that the general words of a statute ought not to include the government, or affect its rights, unless that construction be clear and undisputable upon the text of the Act.' "

*Accord, Harden v. Mass Transit Administration,* 277 Md. 399, 354 A. 2d 817 (1976); *Public Indemnity Co. v. Page,* 161 Md. 239, 156 A. 791 (1931); *County Comm'rs of Balto. Co. v. Board, Etc., of Md. Hospital, Etc.,* 62 Md. 127 (1884); *State v. Balt. & Ohio R.R. Co.,* 34 Md. 344 (1871). Thus, since the General Assembly has neither named the State nor manifested an intention that the State be bound in the provisions of the Zoning Enabling Act, Baltimore City has no authority to subject the State's use of the Continental Can property to its zoning ordinance.[1]

(2)

Baltimore City next contends that the title of Ch. 671 of the Acts of 1977 violates Art. III, § 29, of the Maryland Constitution. Art. III, § 29, requires that:

"[E]very Law enacted by the General Assembly shall embrace but one subject, and that shall be described in its title."

The City argues that the title of the Act is misleading and thus does not adequately describe its subject matter.

The title of Ch. 671 begins, in pertinent part, as follows:

"FOR the purpose of authorizing the creation of a State debt in the amount of . . . $87,430,100, the

---

[1]. When the General Assembly has intended that State public works projects be subject to local authority, it has done so expressly. For example, Code (1957, 1976 Repl. Vol.), Art. 27, § 706 (a), which has since been repealed [Code (1957, 1976 Repl. Vol., 1976 Cum. Supp.), Art. 27, § 706] provided that the power of the State to build community correction centers was subject to the "approval of the local governing authority."

proceeds thereof to be used for certain necessary building, construction, demolition, planning, deferred maintenance and equipment purposes of this State, and for acquiring certain real estate and options in connection therewith; providing generally for the issue and sale of bonds evidencing said loan; providing, under certain circumstances, that general funds be used to pay the principal and interest of said bonds."

The City concedes that if the title had ended at this point, it would have satisfied the requirements of Art. III, § 29. The sufficiency of similar titles has in fact been established by this Court.[2] However, the title goes on to enumerate a substantial number of projects contained in the Act. The City argues that the inclusion of this list in the title would lead a reader to believe that the Act is limited to the enumerated projects, and no others. Thus, since the authorization for the acquisition of the Continental Can site is not included in this list, the City urges that the title is misleading and the Act invalid.

The purpose of the title requirement is to inform " 'the members of the legislature and the public of the nature of the proposed legislation.' " *City of Bowie v. County Commissioners*, 258 Md. 454, 467, 267 A. 2d 172 (1970). However, this Court has repeatedly stated that the title of an act need not give an abstract of its contents. *Madison National Bank v. Newrath*, 261 Md. 321, 275 A. 2d 495 (1971); *Clinton Volunteer Fire Dept. v. Board of County Commissioners*, 259 Md. 456, 270 A. 2d 778 (1970); *Leonardo*

---

**2.** In McKeldin v. Steedman, 203 Md. 89, 104, 98 A. 2d 561 (1953), the following title of the General Construction Loan of 1953 was said to be "accurately descriptive and unexceptionable."

"AN ACT to authorize the creation of a State Debt in the aggregate amount of Fifteen Million Forty Thousand Nine Hundred and Fifty Dollars ($15,040,950), the proceeds thereof to be used for certain necessary building, construction, deferred maintenance, and equipment purposes of this State, for acquiring certain land and providing generally for the issue and sale of Certificates of Indebtedness evidencing such loans."

*v. Board of County Commissioners,* 214 Md. 287, 134 A. 2d 284, *cert. denied,* 355 U. S. 906, 78 S. Ct. 332, 2 L.Ed.2d·260 (1957); *Pressman v. State Tax Commission,* 204 Md. 78, 102 A. 2d 821 (1954); *Neuenschwander v. Washington Suburban Sanitary Commission,* 187 Md. 67, 48 A. 2d 593 (1946). Thus, the mere fact that a title goes on to mention many specific projects does not mean that it must therefore list all such projects, as long as the title of the act fairly informs the reader of its nature.

The title of the subject Act accomplishes this. It begins with a broad statement of general purpose which sufficiently describes the contents of the Act. We find no suggestion in the title that this general purpose is meant to be limited to the enumerated projects which follow. In fact, *all* of the enumerated projects which follow the statement of general purpose are mentioned in connection with the amendment of *earlier* General Construction Loans. The title is, therefore, in no way misleading, and it satisfies the requirements of Art. III, § 29.

(3)

It is further claimed that Ch. 671 violates Art. III, § 52 (8)· (a), of the Maryland Constitution, which requires that every supplementary appropriation bill be "limited to some single work, object or purpose." [3]

Chapter 671 authorizes a State debt in excess of 87 million dollars by providing for the State's issuance and sale of bonds. The Act complied with the provisions of Art. III, § 34, of the Maryland Constitution, relating to State debt. The bond sale proceeds are appropriated by Ch. 671 for a variety of State capital projects. In addition, the Act provides for grants to non-profit institutions in Baltimore City and the City of Annapolis for certain specified projects.

---

**3.** Article III, § 52, provides for a comprehensive executive budget system for the State. For a discussion of the history and operation of this system, *see* Md. Act. for Foster Child. v. State, 279 Md. 133, 367 A. 2d 491 (1977); Panitz v. Comptroller, 247 Md. 501, 232 A. 2d 891 (1967); McKeldin v. Steedman, 203 Md. 89, 98 A. 2d 561 (1953); Dorsey v. Petrott, 178 Md. 230, 13 A. 2d 630 (1940).

Because the proceeds of the bond sale are appropriated for a variety of projects, the City argues that Ch. 671 is not "limited to some single work, object or purpose."

This Court, however, has previously construed the requirements of Art. III, § 52 (8) (a), with specific regard to supplementary appropriation bills which authorize the creation of State debts for a variety of projects. In *Panitz v. Comptroller*, 247 Md. 501, 513-514, 232 A. 2d 891 (1967), this Court, speaking through Chief Judge Hammond, stated:

> "We think the creation of a State debt in a specified amount in the manner prescribed in § 34 of Art. III by a Supplemental Appropriation Bill gratifies the dictates of § 52 (8) (a) *even though the cash which is to result is directed to be used for multiple purposes.*

> * * *

> "We think § 52 recognized that § 34 contemplated a bill which created a debt of the State and provided for the payment of the interest and principal as specified was a separate appropriation bill, a single package, which, in the later words of § 52 (8) (a), *stated therein the 'single work, object or purpose' — the obtention of funds for State purposes from lenders — to which it was limited.*" (Emphasis supplied.)

This is dispositive of the issue. Even though Ch. 671 embraces a variety of projects, it falls squarely within the requirements of § 52 (8) (a) as interpreted in *Panitz*, and as such is limited to a "single work, object or purpose."

(4)

It is also alleged that the members of the Board of Public Works and other state officials either violated or disregarded a number of statutory provisions concerning the acquisition of property in the negotiation and approval of the Continental Can site lease. For example, it is asserted that there was a violation of Code (1957, 1975 Repl. Vol.),

Art. 78A, § 19A, which requires that "[l]and for all public improvements . . . shall be negotiated exclusively by . . . [the Land Acquisition Division of the Department of General Services]." Statutory requirements relating to appraisals, advertising, maximum rental, etc., were claimed to have been violated in connection with the lease for the Continental Can site.

We assume for purpose of argument that the actions of various state officials relating to the lease would have violated certain statutory provisions absent the enactment of Ch. 671. However, Ch. 671 explicitly directs that

"(IV) The State and the seller of the [Continental Can site] *shall* negotiate the price *in accordance with the terms of the lease* dated December 3, 1976, but the price shall not exceed 2,900,000." (Emphasis supplied.)

Thus, Ch. 671 specifically authorized governmental action in accordance with the lease agreement. By this authorization, the General Assembly, in effect, excepted the actions of the government officials in connection with this lease agreement from the particular statutory requirements relied on in this case.

Intervenors, however, argue that the above-quoted provision of Ch. 671 is unconstitutional because it represents "an attempt to legislate in the budget in that it is an attempt to amend or repeal existing legislation governing acquisition of state property." This argument is without merit.

In support of their contention that the General Assembly may not "legislate in the budget," intervenors refer to two opinions of the Attorney General, 37 Op. Att. Gen. 139 (1952) and 59 Op. Att. Gen. 70 (1974). While not in any way binding on this Court, the opinions of the Attorney General deserve consideration. *Drug & Chem. Co. v. Claypoole,* 165 Md. 250, 166 A. 742 (1933). However, assuming arguendo that we fully agreed with the cited opinions of the Attorney General, intervenors' reliance would still be wholly misplaced. The opinions of the Attorney General do not at all concern

supplementary appropriation bills. Rather, they concern the extent to which the General Assembly may make alterations or attach conditions to the annual *Budget Bill* submitted by the Governor. The opinions of the Attorney General are based on the unique constitutional provisions which pertain to the Budget Bill. In particular, the Budget Bill, unlike other bills, becomes law upon the mere approval of the General Assembly, and is not subject to the Governor's veto. On this ground, the Attorney General believed that conditions attached to the Budget Bill by the General Assembly which repealed pre-existing statutes were not valid. But Ch. 671 of the Acts of 1977 is manifestly *a supplementary appropriation bill, Panitz v. Comptroller, supra,* 247 Md. at 514; *McKeldin v. Steedman,* 203 Md. 89, 100-103, 98 A. 2d 561 (1953). As such, it must be submitted to the Governor for his signature and is subject to his veto, Art. III, § 52 (8) (d), of the Maryland Constitution. However we might regard the Attorney General's opinions concerning the annual Budget Bill, it is obvious that they have no application to a supplementary appropriation bill.

### (5)

The provisions of Ch. 671 concerning a prison at the Continental Can site are also challenged on the ground that the State Department of Public Safety and Correctional Services, in connection with the request to the General Assembly for an appropriation for the prison, had failed to comply with the Maryland Environmental Policy Act, Code (1974, 1976 Cum. Supp.), § 1-301 *et seq.,* of the Natural Resources Article.

The Environmental Policy Act requires a state agency to prepare an "environmental effects report" for each "proposed state action" significantly affecting the environment. This report must include a discussion of the effects of the proposed state action on the environment. As we stated in *Pitman v. Wash. Sub. Sanitary Comm'n,* 279 Md. 313, 368 A. 2d 473 (1977), the types of "proposed state actions" which require the filing of these reports are limited

to requests to the General Assembly for appropriations or other legislative actions.[4]

The Department of Public Safety and Correctional Services did file an environmental effects report, but it is claimed that the report was insufficient and did not comply with the requirements of the Environmental Policy Act.

It is first argued that this alleged non-compliance renders Ch. 671, insofar as it authorizes the prison, invalid. This argument is obviously without merit. Absent some constitutional infirmity, a court has no power to declare void an act of the General Assembly. The mere fact that officials of the Executive Branch of the government may have failed to comply with a previously enacted statute furnishes no basis for invalidating a subsequent enactment by the Legislative Branch of the government. The contention that the General Assembly might have been misled by the absence of a proper environmental effects report is of no avail. See Townsend v. Yeomans, 301 U. S. 441, 451, 57 S. Ct. 842, 847, 81 L. Ed. 1210 (1937). Cf. Calder v. People of State of Michigan, 218 U. S. 591, 598, 31 S. Ct. 122, 123, 54 L. Ed. 1163 (1910); County Council v. District Land, 274 Md. 691, 704, 337 A. 2d 712 (1975); Mayor of Balt. v. State, 15 Md. 376, 461 (1860).

It is apparently argued, in the alternative, that even if Ch. 671 is valid, the Department of Public Safety and Correctional Services should be enjoined from further action concerning the prison until a proper environmental effects report is filed. We disagree. This alleged non-compliance affords no basis on which to enjoin the acts of an agency undertaken pursuant to a legislative directive. As we noted in Pitman v. Wash. Sub. Sanitary Comm'n, supra, 279 Md. at 315 n. 1, the definition of "proposed state action" in the Maryland Environmental Policy Act is a narrow one. It concerns only requests made by state agencies to the

4. This Court has not yet decided whether the Maryland Environmental Policy Act was intended to create any judicially enforceable rights in private parties. See Pitman v. Wash. Sub. Sanitary Comm'n, 279 Md. 313, 316-317, 368 A. 2d 473 (1977). In light of our disposition of the contentions in the instant case, it is not necessary for us to reach that question here.

General Assembly for legislative action. It does not include actions taken by state agencies in accordance with legislative directives. Thus, the conversion of the Continental Can site, undertaken pursuant to the provisions of Ch. 671 of the Acts of 1977, does not require the filing of an environmental effects report under the clear terms of the Environmental Policy Act.

### (6)

Article III, § 15 (1), of the Maryland Constitution provides that the "General Assembly may continue its session . . . for a period not longer than ninety days in each year." The 1977 session of the General Assembly could not constitutionally continue beyond midnight of April 11. Chapter 671 was the next to last bill considered by the Senate, and it was argued in the trial court proceedings that it was finally passed by the Senate after the deadline mandated by the Constitution.

The Journal of the Senate of Maryland was submitted by the State to establish the timely passage of Ch. 671. The last page of the Journal showed that the Senate adjourned exactly at midnight of the 90th day of the session. If this notation is accurate, then Ch. 671 must have passed before midnight and within the constitutionally mandated time.

To controvert the Senate Journal, an affidavit was offered purporting to show that Ch. 671 had been passed after midnight. According to the affidavit of John Douglass, a member of the General Assembly,

> "When the final vote was taken on Senate Bill 278 [Ch. 671], immediately after observing the voting tabulation display the results of said vote, I turned to the official clock and carefully noted that the time displayed was 12:02 o'clock a.m., Thursday . . . ."

The trial court, however, held that the Journal could not be contradicted by extrinsic evidence and that, therefore, the affidavit did not create a genuine dispute as to any material fact. This ruling is attacked on appeal.

The Constitution of Maryland requires that every bill passed by the General Assembly must, *inter alia*, be sealed with the Great Seal, signed by the Governor, and filed with the Court of Appeals. Art. III, § 30. In Maryland, an act thus duly authenticated bears a strong presumption that it has been validly enacted. Initially this Court seemed to be of the opinion, at least with regard to the contents of an act, that this presumption was absolute and that there was no principle on which "the Court could be justified in going behind evidence so fully presented by the Constitution, and inquiring, on extrinsic proof, into the verity of the contents of an Act of the Assembly so attested." *Mayor, Etc., of Annapolis v. Harwood and Wife*, 32 Md. 471, 478 (1870); *cf. Fouke v. Fleming & Douglass*, 13 Md. 392, 413 (1859).

However, in *Berry v. Baltimore and Drum Point Railroad Co.*, 41 Md. 446, 20 Am. Rep. 69 (1875), the Court determined that, at least in some circumstances, the presumption is not absolute, and that the Court may look behind the authenticated bill to other competent evidence. In *Berry*, the legislative journals and the engrossed bill showed that the contents of the bill as passed differed from the contents of the authenticated act. No evidence to the contrary was offered. In these circumstances, the Court, speaking through Judge Alvey, stated (41 Md. at 462, emphasis supplied):

> "Unquestionably, where an Act has been duly authenticated and published as law by authority, the presumption is, that all the constitutional solemnities and prerequisites necessary to its valid enactment have been complied with; and this presumption exists until the contrary is clearly made to appear. But when it can be made clearly to appear, as in this case it has been, that the particular bill or section of a bill, although it may have all the forms of authentication, has never in fact received the legislative assent, we think the Court is bound to look not only behind the printed statute book, but beyond the forms of authentication of the bill as recorded in the office of

this Court, and *if the evidence be clear and entirely satisfactory to the mind of the Court,* to decide accordingly."

However, the type of evidence which the Court has considered sufficient to rebut the presumption of validity has been quite limited, and all cases have stressed that such evidence must be clear and entirely satisfactory to the court. In *Legg v. Annapolis,* 42 Md. 203 (1875), the Court deemed sworn testimony, to the effect that the contents of an authenticated act differed from the bill as passed, insufficient to defeat the presumption of validity. The Court, again speaking through Judge Alvey, said (42 Md. at 223-224):

"[T]he question whether a statute has been constitutionally enacted by the Legislature cannot be tried upon mere *ex parte* affidavits, nor upon any other than the best and most reliable evidence. . . . The onus of proof was upon the appellees, with a strong presumption against the right asserted by them, and before that right could be recognized and judicially declared, in the face of a public statute, *having almost a conclusive presumption in its support,* the appellees were bound to furnish the most conclusive evidence of the truth of the facts upon which they rely to invalidate the statute." (Emphasis supplied.)

In *Baltimore Fidelity Warehouse Co. v. Canton Lumber Co.,* 118 Md. 135, 138-139, 84 A. 188 (1912), it was observed that:

"The Court, however, in the case of *Berry v. Baltimore & Drum Point R. R. Co., supra,* . . . cautiously observed that they did not decide therein that the journals of the two Houses, though required by the Constitution to be kept as records of the proceedings, would be evidence *per se* upon which the validity of a statute having the required authentication could be successfully questioned as to the manner of its enactment, but held that the

journals, in connection with other competent evidence upon the subject, could be examined as a means of information to aid in arriving at a correct conclusion as to what was the action of the Legislature on any particular bill before it."

In *Ridgely v. City of Baltimore*, 119 Md. 567, 585, 87 A. 909, 915 (1913), the Court stated:

"It would seem to be definitely settled in this state that an authenticated statute cannot be impeached by the Legislature journals alone, or by mere parol evidence."

*Accord, Richards Furniture v. Board*, 233 Md. 249, 196 A. 2d 621 (1963); *Jessup v. M. & C. C. of Balto.*, 121 Md. 562, 89 A. 103 (1913). *Cf. Redwood v. Lane*, 194 Md. 91, 69 A. 2d 907 (1949); *Miggins v. State*, 170 Md. 454, 184 A. 911 (1936).

In *Thrift v. Towers*, 127 Md. 54, 95 A. 1064 (1915), the validity of an enactment was challenged on the grounds that the original Senate Bill, including its title, was amended in the course of the Senate's proceedings, but that thereafter, in the Senate and the House, the bill was read by its original title. The Court stated that the legislation, if read only under the original title, would have been invalid as the original title was not descriptive of the amended bill. The legislative journals, although deemed ambiguous by the Court, referred to the bill by its original title. In addition, the original title was printed on the back of the amended bill. In upholding the validity of the enactment, the Court stated (127 Md. at 60-61):

"[I]f it be conceded, that the bill was possibly or probably read in the House by its original title, this would not be sufficient to justify the Court in declaring it void. When a bill is properly authenticated it cannot be impeached by the Journals alone, or by oral testimony that some provision of the constitution was not observed in its passage, and certainly the inference that the bill was read by its original title drawn from the fact

that the printer by mistake or inadvertence printed the original title on the back of the amended bill is not sufficient to justify the Court in striking the Act down. To establish his position the appellant was bound to show by competent and clear evidence that the original title *alone* was read. Mere inferences, possibilities, and probabilities will not do. The ground of the attack must be plainly and clearly established. The rule which holds that a duly authenticated and published Act is presumed to have been validly passed, and that this presumption cannot be rebutted unless it appears by clear and competent evidence that some requirement of the constitution has been disregarded in the passage of the bill rests upon sound principles of reason and public policy."

In *Thrift*, although it was conceded that both the journals and the other evidence might have suggested that constitutional procedures were violated, the Court reaffirmed the strong presumption which attaches to a duly authenticated act, indicating that even "probabilities" are insufficient grounds on which to attack its validity.

In the instant case, unlike the situation in *Thrift*, not even the journal is inconsistent with the presumption of validity which attaches to a duly authenticated enactment. Here, the legislative journal shows timely passage, while extrinsic evidence is offered to show passage after the close of the legislative session. With respect to a procedural issue such as is presented in this case, this Court has not had occasion to consider whether extrinsic evidence could ever be sufficient to impeach a duly authenticated act when the legislative journal clearly reinforces the presumption of validity which attaches to the act.

The other states which have considered this question appear to be in general accord. The legislative journals have been consulted by the courts with regard to the question of timely passage of an act, but the courts have not allowed the journals to be impeached by other evidence.

In *White v. Hinton*, 3 Wyo. 754, 758, 30 P. 953 (1892), the court refused to allow testimony to impeach the records of the legislative journals which indicated timely passage, stating:

> "To these records resort is had in case of any question as to the correctness of the published statutes. . . . It is not to be tolerated that the courts or the people should depend upon or resort to the recollection of individuals for the statutory law."

Other states in similar circumstances have agreed that the portions of the legislative journals relating to timely passage are conclusive, although they have suggested safeguards designed to curb legislative abuse. In *Standard Oil Co. v. State Board*, 110 Mont. 5, 11-12, 99 P. 2d 229 (1940), the court stated (emphasis supplied):

> "The journals on their face show compliance . . . and the universal rule is that in an attack on the validity of a legislative enactment the journals import absolute verity. They show the action of the assembly. They are the official records of one of the three coordinate branches of the government, and *certainly at least in an action where a legislative enactment is collaterally attacked, they are binding on the courts.*
>
> "Every law enacted in the last few days of the session, and particularly on the last day, could not be considered effective until testimony was taken before a court and until, on the statements of witnesses as to the time of the final enactment of the bill the court had determined the law's validity. And certainly *to allow this attack in anything but a direct proceeding to correct the journal* where the various officers of the assembly would be parties, cannot be countenanced by any court."

*See also State ex rel. Lane Drug Stores v. Simpson*, 122 Fla. 582, 166 So. 227 (1935).

In *Earnest v. Sargent*, 20 N. M. 427, 433, 150 P. 1018 (1915), the court refused to allow testimony to contradict the journal record, stating (emphasis supplied):

> "If the journal can be contradicted about matters of this kind, then no legislation passed on the last day of the session will be of any validity whatever. A controversy might arise in time as to whether the time for adjournment had arrived before the conclusion of the business of the session, and as many differences of opinion might arise as there are members of the houses. Watches and clocks would be the criterion, and one member might claim that the hour of 12 had arrived by his watch, and another member might claim that the hour of 12 had not arrived by his watch. Therefore, when the Legislature writes its journal, and states, as this journal states, that all of the business involved in this discussion had been completed before the moment of time for adjournment had arrived, the rule of law and the rule of common sense is that it shall not be contradicted by the evidence of witnesses. *It may be that an exception to this rule might be founded upon a gross and flagrant violation of the constitutional restriction* as to the length of the legislative session, but we have no such case before us here."

In *State v. Winters*, 147 W. Va. 861, 132 S.E.2d 374 (1963), the Supreme Court of Appeals of West Virginia struck down a statute passed some 18 minutes past the constitutionally mandated close of the legislative session. In this case, however, the House of Delegates Journal itself contained evidence that the House had stopped its clock at a certain point in its proceedings. The court reaffirmed its earlier holdings that the official legislative records were conclusive but it held that where the official records themselves disclosed an ambiguity, omission or conflict, a court could look to extrinsic evidence. The court stated (132 S.E.2d at 380):

"[A] bill duly enrolled, authenticated and approved is presumed to be correct but the courts may look to the journals of the legislature and to other official records to determine whether such an act was passed in accordance with constitutional requirements. If the legislative journals of either house of the legislature disclose on their face an omission, ambiguity or conflict in relation to the question of compliance with or failure to comply with constitutional requirements, resort may be had by a court to extrinsic evidence for the purpose of resolving such omission, ambiguity or conflict."

In light of the strong presumption of validity which attaches to a duly authenticated act in Maryland, and in agreement with the uniform decisions of other states regarding the status of the legislative journals, we hold that when the presumption attaching to a duly authenticated statute is reinforced by unambiguous legislative journals, the presumption becomes virtually conclusive and cannot normally be rebutted by extrinsic evidence. The affidavit in the instant case is thus insufficient to rebut the presumption of validity which has attached to Ch. 671. To hold otherwise would certainly not be consistent with this Court's often repeated admonition that "a statute which has been duly authenticated is not to be impeached by parol evidence alone." *Richards Furniture v. Board, supra,* 233 Md. at 261; and *see Miggins v. State, supra,* 170 Md. at 460; *Jessup v. M. & C. C. of Balto., supra,* 121 Md. at 566; *Ridgely v. City of Baltimore, supra,* 119 Md. at 585; *Legg v. Annapolis, supra,* 42 Md. at 224; *Fouke v. Fleming & Douglass, supra,* 13 Md. at 413. It is not necessary for us to decide what particular limitations to this principle might be appropriate in an extreme case to insure against legislative abuse. No such case is now before us.

(7)

Finally, it is urged that the accelerated schedule adopted by the trial court violated due process of law in that several of the parties were allegedly unable, under the time

constraints, "to meaningfully prepare their case or be heard in support of it."

Although all parties had agreed to an accelerated schedule, a motion by the plaintiffs in the circuit court case for an extension of time was denied by the lower court. Judge Greenfeld, in ruling on this motion in the trial court, stated:

> "Now, the plaintiffs also have filed a motion to continue the hearing on the defendants' motion for Summary Judgment, and state as a ground therefor that the plaintiffs need more time to respond to the motion for Summary Judgment because of the complexity of the issues that are involved. The Court file will note that this suit was filed on May 18, 1977. A pre-trial conference was held with all parties on May 20th, and many of the issues involved in the case were preliminarily and informally discussed. The Court then set an accelerated time-table for the reasons that the plaintiffs set forth in their motion, and on May 20th that case was scheduled for a hearing on June 10th, last Friday, and on June 3rd, after another lengthy pre-trial conference held at the plaintiffs' request, the Court extended the hearing date to June 13th instead of June 10th, and the plaintiffs were allowed to engage in certain discovery and further extensions of time were granted to file their legal memorandum. Under that extension the plaintiffs' memorandum was due to be filed on June 10th, but again, at the plaintiffs' request, the Court extended this deadline to the following day. Over the weekend the Court has read the plaintiffs' memorandum of law and is completely satisfied that the relevant issues have not only been raised by the plaintiffs, but they are ably and professionally presented. I might say that it is apparent to me that all of the attorneys of this case have put forth an extraordinary amount of effort to maintain the time-table established by the Court,

and the Court commends each and every attorney, and law clerk.

"By the same token, it is apparent to the Court the case is ready for hearing and the plaintiffs' motion for further time is denied."

Based on our examination of the material submitted to the trial court and the comprehensive briefs submitted to this Court, we agree with Judge Greenfeld that the parties' positions were fully argued. This satisfies the requirements of due process. As this Court stated in *Durkee v. Murphy*, 181 Md. 259, 268, 29 A. 2d 253 (1942), before an accelerated court schedule can "amount to a deprivation of due process of law . . . whatever the difficulty, or even hardship, that might be caused, there should be some definite loss of right resulting to justify a reversal." In the instant case, there is nothing in the record which even suggests that any of the facts or principles of law involved were not adequately developed for the court's consideration.