Dear Delegate Exum:
You have requested our opinion on a series of questions involving the proposed sale of certain property in Prince George's County ("Wilson Farm") and its development as a professional football stadium and regional sports complex. Specifically, you have asked:
1. Would the sale violate § 7-106(f) of Article 28 of the Maryland code if any portion of Wilson Farm is sold to a private developer before it is first offered to certain governmental entities and, upon their declination, placed in the park system of the Maryland National Capital Park and Planning Commission (MNCPPC)?
2. If any part of Wilson Farm is sold to a private developer, would § 7-106(f) of Article 28 require that sale proceeds representing monies derived from the Land Acquisition Fund be returned to that Fund?
3. If any part of Wilson Farm is sold, would § 5-906(d)(7) of the Natural Resources ("NR") Article require the approval of State officials and replacement of the transferred property with land of at least equivalent area and of equal recreation or open space value? and
4. Would § 8-601(b) of the Transportation ("TR") Article prevent the Department of Transportation from spending State monies to construct an interchange to I-95/I-495 at Arena Drive to provide access to a football stadium on the Wilson Farm site?
For reasons detailed below, it is our opinion that none of these provisions are either triggered or violated by the proposed sale and development of the Wilson Farm property.
 I History of the Project
A. Government Acquisition of Wilson Farm
On April 14, 1995, the Prince George's County Council enacted an ordinance (CB-13-1995) authorizing the MNCPPC to purchase the approximately 300-acre Wilson Farm tract with monies from the Land Acquisition Fund established under § 7-106 of Article 28. Although the ordinance did not specify the amount of funds authorized, it was anticipated that $3,075,000 of the $6,150,000 purchase price for the property would come from this source. On April 19, the Board of Public Works ("BPW") approved an agreement between the Department of Natural Resources ("DNR") and MNCPPC, under which DNR would contribute $3,075,000 in "State Side" Program Open Space ("POS") funds to acquire the property. The BPW agenda item described the project as a "50/50 joint funded acquisition", although title to the property would vest in MNCPPC.[1] The fund identified as the source of State monies was the Advance Option and Purchase Fund. A condition specified in both the agenda item and the agreement was the requirement that the MNCPPC reimburse the State for its funding of the purchase, if any part of the site was used for the development of a professional football stadium. The agreement contained the following additional condition:
 Except as described in the preceding paragraph [dealing with MNCPPC reimbursement for stadium use], the Property may not be converted from public recreation or open space use to any other use without the prior written approval of the Secretary of DNR, the Secretary of the Department of Budget and Fiscal Planning and the Director of the Office of Planning, and any conversion in land use may be approved only after the local governing body replaces the Property with land of at least equivalent area and of equal recreation or open space value.
Finally, the BPW agenda item noted that the Board's approval of the transaction was contingent upon approval by House and Senate budget committees, a condition that was subsequently satisfied.See Letter from Budget Committee Chairmen to the Hon. John R. Griffin, dated April 7, 1995.
The $6,150,000 purchase price for Wilson Farm was paid to the seller by the MNCPPC in two installments, one-third on April 28, 1995, and the remainder on August 11, 1995.[2]
B. Proposed Development of the Property
Subsequently, the MNCPPC decided to sell approximately 200 acres of the Wilson Farm site to Jack Kent Cooke, the owner of the Washington Redskins for $4.1 million. A professional football stadium was to be constructed on this portion and the remaining 100 acres was to be retained for use as a regional sports complex. In February of 1996, the Prince George's County Planning Board and later the MNCPPC declared the 200-acre site as surplus and not to be used for park and recreation purposes. On March 13, 1996, the MNCPPC requested the County Executive and the County Council to amend the Commission's capital improvement program for park development to include the 100-acre sports complex at a projected cost for FY 1996 of more than $12 million.[3] Funding for FY 1996 was expected to come from $3 million in State bond monies, $4.1 million the MNCPPC was to receive from the sale to the Redskins, $3 million from a foundation grant, and $1.9 million in State POS funds and local funds. See Prince George's County Planning Board letter to Hon. Wayne K. Curry and Hon. Stephen J. Del Giudice, dated March 13, 1996. At approximately the same time, the Prince George's County Planning Board recommended a Preliminary Minor Public Facility Amendment to add a proposed interchange at I-95/I-495 to provide access for the Redskins Stadium. See Prince George's County Planning Board letter to the Hon. Stephen J. Del Giudice, dated March 20, 1996.
 C. General Assembly Action
The allocation of responsibilities and funding for these projects and the construction of infrastructure for the new stadium were major issues at the 1996 session of the General Assembly. See Department of Fiscal Services The Sine Die Report
(April 9, 1996) at 63-65. And at the close of the session, three separate pieces of legislation contained provisions affecting the Redskins stadium and the regional sports complex: The Capital Budget bill, Chapter 125, Laws of 1996; the Budget Bill, Chapter 13, Laws of 1996; and a measure relating to "Financing State Government", Chapter 600, Laws of 1996.
The Capital Budget bill at Item 50.01.00(G) appropriated $3 million as a grant to MNCPPC to assist in the construction of the regional sports complex but also provided that these funds could not be expended "until construction of a National Football League Stadium on the remainder of the Wilson Farm property commences." A further proviso was that $1,968,000 was to be provided in the FY 1997 budget bill "for the purchase of the property" — an expenditure that as a practical matter would have an impact on MNCPPC's obligation under its April 20, 1995 agreement with DNR to repay State POS funds because a part of Wilson Farm was to be used for the development of a stadium.[4] Finally, the Capital Budget bill stated that Prince George's County was not prevented "from using its local share of Program Open Space funds, or other non-State funds for this complex."
The FY 1997 Budget Bill at Item 29.02.01 contained detailed provisions on the expenditure of funds "for the construction of State or County roadways required for access to the proposed Redskins Stadium on the Wilson Farm property."[5] Included in this budget detail are allocations of State, county and private funding and identification of the specific roads affected, one being Arena Drive east to the I-95 Interchange and another the Arena Drive Interchange to the Capital Beltway.[6]
Finally, Section 6 of Chapter 600 included provisions on the application of the State procurement law to the stadium project and on the authority of the Department of Transportation over construction "on interstate and interstate related projects".
 II MNCPPC Funding
Section 7-106(f) of Article 28 provides that:
 At any time after the acquisition [of land authorized by § 7-106(d)], the Commission may transfer the land so acquired in any case to any construction agency of the State of Maryland, to the county, or to any incorporated municipality of Prince George's County, upon repayment to the Commission of the funds so disbursed by the Commission for the land, plus interest. The amount of the repayment shall be placed in the land acquisition revolving fund. If the land acquired in any case is determined by the State construction agency for the county or municipality not to be required for public use, the Commission may use the land as part of its park system, subject to the approval of the County Commissioners but this use by the Commission for park or recreation purposes is not a dedication for these purposes. If the land is determined by the Commission at any time not to be needed for park purposes the Commission may dispose of it in the manner provided elsewhere in this article. [Emphasis added].
This subsection authorizes but does not require the MNCPPC to transfer land to various public agencies. The statutory language does not suggest a mandatory right of first refusal. Contrast NR Article, § 5-904(e)(2) (right of first refusal with respect to disposal of certain POS property). Therefore, it would not violate § 7-106(f) for the MNCPPC to sell 200 acres of the Wilson Farm property to the Redskins without first offering the land to the public agencies named in the statute.
Although § 7-106(f) mandates repayment of sale proceeds to the Land Acquisition Fund if the MNCPPC transfers property to the named governmental entities, it does not expressly state what would happen if the property is transferred to a private party. However, the last sentence of § 7-106(f) provides that "[i]f the land is determined by the Commission at any time not to be needed for park purposes, the Commission may dispose of it in the manner provided elsewhere in this article." And § 5-111 of Article 2B in the broadest of terms authorizes MNCPPC without restriction to sell or transfer land that is not needed for park purposes. In our opinion, the law does not establish any mandatory repayment mechanism for Commission sales of land to private parties when the property is no longer needed for park purposes. Thus, § 7-106(f) would not be violated if such a repayment does not occur with respect to the Wilson Farm property.[7]
 III Program Open Space Issues
Section 5-906(d)(7) of the Natural Resources Article provides that with respect to POS local projects:
 Land acquired or developed under a State grant from Program Open Space may not be converted without written approval of the Secretary, the Secretary of the Department of Budget and Fiscal Planning, and the Director of the Maryland Office of Planning from outdoor public recreation or open space use to any other use. Any conversion in land use may be approved only after the local governing body replaces the land with land of at least equivalent area and of equal recreation or open space value. . . .
In our opinion, the MNCPPC is not required to obtain the approvals specified in § 5-906(d)(7) or to find replacement land for the portion of the Wilson Farm property that is being sold for the Redskins Stadium. This is so because the initial agreement for the purchase of the property was governed by NR § 5-904, not § 5-906.
Title 5, Subtitle 9 of the Natural Resources Article governs the administration of Program Open Space, a State and local land acquisition and recreational development program funded through the State transfer tax. One half of the funds available for this program are used for recreation and open space purposes by the State ("State Side POS Funds") and the other half of the funds are used to assist local governing bodies in the acquisition and development of land for recreation and open space purposes ("Local Side POS Funds"), NR Art. § 5-903(a) and (c).
State Side POS Funds were used to acquire the Wilson Farm property, not Local Side Funds. This is clear from the source of the funds, the description of the purchase on the BPW agenda, and the procedures under which the purchase was approved, including expenditure from the Advance Option and Purchase Fund upon BPW approval, § 5-904(b)(2) and (6), and review of the proposal by the budget committees of the General Assembly, § 5-904(b)(5). Because the transaction was governed by § 5-904 procedures for State projects and not those of § 5-906 for local ones, the approval and replacement requirements of § 5-906(d)(7) are not applicable.[8]
 IV I-95 Issue
Section 8-601(b) of the Transportation Article provides, in relevant part, that the Department of Transportation "may not spend any further funds for the construction of I-95 through Prince George's County that will involve a new or reconstructed segment connecting it to any other highway in Prince George's County." In our opinion, this provision does not bar the expenditure of funds to construct an interchange to I-95/I-495 at Arena Drive to provide access to a football stadium on the Wilson Farm site.
Section 8-601(b) was enacted in 1976 in reaction to I-95 "being continued beyond the Beltway through Prince George's County to Washington, D.C." See Preamble to Senate Bill 749 (1976), Chapter 606, Laws of 1976. The ordinary meaning of "new or reconstructed segment" is consistent with this purpose and would not include an interchange. In addition, this statute has not been construed in the past by highway officials to ban the construction of an interchange along I-95/I-495. For example, an interchange was created in 1990 in Greenbelt to provide a Park and Ride and access to a Metro station and its funding was not affected by § 8-601(b). Finally, the General Assembly itself in the FY 1997 budget bill specifically authorized this particular interchange, and apparently construed § 8-601(b) as not applicable to this improvement. For these reasons, we conclude that § 8-601(b) would not be violated by the construction of the proposed interchange.
 V Impact of General Assembly Actions
As a result of the General Assembly actions described above in I-C, a question naturally arises whether the Legislature has, in essence, ratified the sale of the Wilson Farm property, its use as a stadium, and the permissibility of its infrastructure projects, regardless of any previous alleged disregard of other statutory requirements, such as those you have raised. A similar issue was presented in City of Baltimore v. State, 281 Md. 217
(1977), where it was asserted that State officials violated or ignored a number of statutory provisions concerning the acquisition of property in the negotiation and approval of a lease of the Continental Can site in Baltimore City for the construction of a prison. However, the Court of Appeals concluded that the Capital Budget bill had specifically authorized the acquisition in accordance with the lease: "By this authorization, the General Assembly, in effect, excepted the actions of government officials in connection with this lease agreement from the particular statutory requirements relied on in this case." 281 Md. at 228.
From the detail the Legislature employed in three different measures to allocate and interrelate State, county and private fiscal responsibility for the Redskins stadium and related projects, its awareness of the terms of the pre-existing transactions, and its apparent desire to assure the success of the enterprise, it can be argued that the General Assembly has effectively ratified the project through legislation and cured any alleged prior legal defect.[9] Nevertheless, this is an issue we need not decide because we conclude that no particular statute has been violated.
 VI Conclusion
In summary, it is our opinion that none of the cited statutory provisions are either triggered or violated by the proposed sale and development of the Wilson Farm property.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Robert A. Zarnoch Assistant Attorney General Acting Counsel for Opinions and
 Janet Bush Handy Assistant Attorney General
 Jodi R. O'Day Assistant Attorney General
[1] The preamble of the agreement noted that the MNCPPC "intends to use the property for a public regional park and open space purposes." See Agreement for Use of Program Open Space Funds, dated April 20, 1995.
[2] Including closing costs, the total amount paid was $6,209,843.
[3] The total expenditure for the project was estimated at more than $37 million.
[4] These funds were also included in Supplemental Budget No. 2 — FY 1997, dated March 18, 1996 at Item 50-01.05.10 (Chapter 13), and were authorized to be expended "from the Advance Option and Purchase projects."
[5] Supplemental Budget No. 1 — FY 1997, dated March 1, 1996 at Item 29.01.01.02, also specified that a $22.5 million grant would provide funds "to relieve traffic congestion" at the proposed stadium.
[6] A schedule to Item 29.02.01 in the Budget Bill listed State funding at $58 million, county funds at $12.5 million, and private funding at $2.5 million. However, the Item also authorized the Secretary of Transportation to provide a grant to the County of up to $12.5 million for construction or improvements to roads "that are not directly located on the Wilson Farm property."
[7] It is noteworthy that $4.1 million received rom the sale of the 200 acre tract to the Redskins will be used to provide a portion of the County's share of funds for a park and recreation facility, viz. the regional sports complex.
[8] The April 20, 1995 agreement itself imposed a similar approval and replacement requirement, but not where the property was sold for use as a professional football stadium. However, the MNCPPC is still bound by the agreement to repay this component of the State's contribution to the purchase.
[9] One difference between the Continental Can case and the present one is that the prison project was ratified only in the capital budget bill — legislation which may validly supersede statutory requirements. See City of Baltimore v. State,281 Md. at 228-29. Although Chapter 125 and Chapter 600 of the Laws of 1996 could supersede statutory requirements, budget bill conditions, such as those in Chapter 13, may not. See Bayne v.Secretary of State, 283 Md. 560, 574 (1972).
 *Page 196