Dear Delegates Elliott and Getty:
You have requested our opinion about the impact of "Smart Growth" funding restrictions on two highway projects in Carroll County that were recently removed from the Maryland Department of Transportation's ("MDOT") Consolidated Transportation Program ("CTP"). Specifically, you have asked the following two questions concerning the Manchester Route 30 Bypass Project ("Manchester Bypass") and the Westminster Route 140 Bypass Project ("Westminster Bypass"):
1. Is either bypass project exempt from the Smart Growth funding restrictions as a result of the "grandfather" provisions of the 1997 Smart Growth legislation?
2. Can an exception to the Smart Growth funding restrictions be sought from the Board of Public Works ("Board") for either bypass project?
For the reasons discussed below, we conclude that:
1. Neither the Manchester Bypass nor the Westminster Bypass is exempted from Smart Growth funding restrictions by the grandfather provisions of the Smart Growth legislation.
2. Either the Carroll County Commissioners or the Secretary of MDOT can seek approval from the Board of Public Works to except the bypasses from the Smart Growth funding restrictions. Such an exception would eliminate a statutory restriction on State funding but would not provide funding for the project. A project excepted from the Smart Growth restrictions is still subject to the normal State budgetary process.
 I The Smart Growth Legislation
A. Funding Prohibition for Growth-related Projects
In 1997, the General Assembly passed, and Governor Glendening signed into law, Senate Bill 389, one of several bills commonly referred to as the "Smart Growth legislation." Chapter 759, Laws of Maryland 1997. Most of the bill was codified as Subtitle 7B of Title 5 of the State Finance and Procurement Article ("SFP") of the Annotated Code of Maryland.
As a general rule, the Smart Growth legislation attempts to discourage unmanaged growth and the attendant environmental degradation by eliminating State financing for projects likely to encourage sprawling development. The preface to Senate Bill 389 stated that the bill was in furtherance of an existing State policy to concentrate growth in suitable areas," to "reduce outward pressure for sprawl and leapfrogging," and, in rural areas, to concentrate growth in existing population centers. Id.Preamble.
To carry out these purposes, this segment of the Smart Growth legislation directs State funding for "growth-related projects" to designated "priority funding areas". Conversely, the statute prohibits State funding of a project outside a priority funding area. See SFP, § 5-7B-04. Significantly, the statute does not prohibit altogether development of growth-related projects or restrict the authority of private developers or political subdivisions to undertake such projects. Rather, it simply prohibits the State from subsidizing such projects outside of designated areas.
Priority funding areas are areas where growth is encouraged under the Smart Growth legislation. The statute itself designates certain priority funding areas — e.g., municipalities, enterprise zones, the areas inside the Baltimore and Capital beltways — and also provides a process for local political subdivisions to designate other such areas by certification to the State Office of Planning. SFP, § 5-7B-02, 5-7B-03,5-7B-08.
The statute includes a lengthy definition of "growth-related project" encompassing a variety of construction, funding, and development assistance programs administered by a number of State agencies. SFP, § 5-7B-01(d). Included in that list are major capital transportation projects. SFP, § 5-7B-01(d)(1)(i).
B. Exceptions From Funding Prohibition
The statute's general prohibition on State funding of growth-related projects outside priority funding areas is subject to a number of exceptions or exemptions.[1] Certain existing projects were grandfathered outside of the Smart Growth prohibitions. The statute also lists certain types of projects that are excepted from the funding restrictions and establishes a process for other exceptions to its funding restrictions.
1. Grandfather Provisions
When it enacted the Smart Growth legislation, the General Assembly recognized that certain projects that would otherwise be subject to the Smart Growth funding restrictions had progressed to a point that they should be excused from the restrictions. Accordingly, it added a grandfather provision to exempt projects that were at certain specified stages of development. The grandfather provisions of the Smart Growth legislation provide that the law does not apply to any project or program for which:
 (a) approval has been granted or a commitment made before October 1, 1998;
(b) a valid permit has been issued;
 (c) a commitment for a grant, loan, loan guarantee, or insurance for a capital project has been granted;
 (d) final review under the National Environmental Policy Act or the Maryland Environmental Policy Act is completed by October 1, 1998; or
 (e) final review through the State Clearinghouse for Intergovernmental Assistance is completed by January 1, 1999.
Chapter 759, § 2, Laws of Maryland 1997.[2]
 2. Exceptions by Statute or by Approval of the Board of Public Works
Even if a project is not grandfathered, it may be exempt from the Smart Growth funding restrictions if it is among certain categories of projects excepted from the operation of the statute or if a special exception is obtained from the Board of Public Works.
Certain specified types of projects are exempt from the funding prohibition without need for approval by the Board of Public Works or any other entity.[3] SFP, § 5-7B-06. Instead, the Office of Planning and the applicable State agency are required to create a procedure to provide notice of, and to receive comments on, proposed exceptions under this provision. SFP, § 5-7B-06(b). The Governor has designated a Smart Growth and Neighborhood Conservation Sub-Cabinet to develop such procedures. Executive Order 01.01.1998.4D(3)(e).
With respect to other growth-related projects, the Board of Public Works may exempt the project from the strictures of the Smart Growth statute in two circumstances. First, the Board can grant an exemption if it finds that there are "extraordinary circumstances." The statute defines "extraordinary circumstances" as:
 (i) the failure to fund the project in question creates an extreme inequity, hardship, or disadvantage that clearly outweighs the benefits from locating a project in a priority funding area; and
 (ii) there is no reasonable alternative for the project in a priority funding area in another location within the county or an adjacent county.
SFP, § 5-7B-05(a)(2)(i)-(ii). Second, the Board may also except from Smart Growth funding restrictions a "transportation project" that meets certain criteria. In particular, the following criteria must be satisfied:
 The Board of Public Works may approve a transportation project under paragraph (1)(ii) of this subsection if the transportation project:
 (i) maintains the existing transportation system, if the Department of Transportation and the Office of Planning determine the project does not serve to significantly increase highway capacity;
(ii) serves to connect priority funding areas, if:
 1. The Department of Transportation and the Office of Planning determine that adequate access control or other measures are in place to:
 A. prevent development that is inconsistent with § 5-7A-01(1), (2), and (3) of this title; and
 B. maintain the viability of the project while concomitantly constraining development which potentially detracts from main street business areas; and
 2. The Department of Transportation and the Office of Planning have first determined whether alternative transportation modes, such as mass transit and transportation demand management, provide a reasonable alternative to the project and that no reasonable alternative exists;
 (iii) has the sole purpose of providing control of access by the Department of Transportation along an existing highway corridor; or
 (iv) due to its operational or physical characteristics, must be located away from other development.
SFP, § 5-7B-05(a)(3).[4]
Application for an exemption from Smart Growth restrictions may be made either by the local governing body of the jurisdiction in which the project is to be located or by the Secretary of the department with approval authority over the project. SFP, § 5-7B-05(b). To assist the Board's consideration of applications for exceptions, the statute permits the Board to obtain advisory opinions from the State Economic Growth, Resource Protection and Planning Commission. SFP, § 5-7B-05(c). To our knowledge, the Board has not yet established any procedures for processing and determining applications for exemptions.
It is important to note that the granting of an exemption by the Board of Public Works under SFP, § 5-7B-05 or the existence of a statutory exception under SFP, § 5-7B-06 does not obligate the State to subsidize or otherwise to fund a particular project. The exception process before the Board of Public Works has sometimes been loosely referred to as an "appeal right." However, this process is not an appeal of a decision of another State entity, but rather a process for eliminating a statutory prohibition. The General Assembly made clear that the Smart Growth legislation was not intended to create a vehicle for appealing funding decisions. SFP, § 5-7B-10. Nor does the grant of an exception by the Board reverse any action of another State agency. In particular, the exception process does not, in and of itself, obtain State funding for a project. Rather, an exception merely eliminates a statutory prohibition that would otherwise bar State funding.
 II The Manchester and Westminster Bypasses
The Manchester Bypass
The State Highway Administration ("SHA") advises us that a highway project to bypass the Town of Manchester west of the town was first included in the Carroll County major road plan in 1960. In 1972, SHA initiated a project planning study for this western bypass. Project planning was suspended in 1980 due to local opposition to the project. The County Plan was then revised to show an eastern bypass alignment and, in 1995, SHA began a new planning study. The new study, considering the eastern bypass alternative, was in the early stages of development with construction likely more than 10 years off when the Manchester Bypass was removed from the Consolidated Transportation Program ("CTP") based on Smart Growth considerations.
The Westminster Bypass
In 1952, Maryland Route 140 ("MD 140") was constructed as a bypass of Main Street in Westminster. The opening of the Northwest Expressway (Interstate 795) in 1987 greatly enhanced accessibility to the Westminster area and placed additional traffic demands on MD 140. In 1987, SHA initiated a project planning study for a new bypass. This study was in its early stages when SHA concluded that improvements to MD 140 would be necessary well before any bypass alternative could be constructed. A portion of the original scope of the project, involving improvements to existing MD 140, was removed from the Westminster Bypass project and is being constructed separately.[5] Recently the remaining part of the Westminster Bypass was removed from the CTP based on both Smart Growth considerations and the adequacy of the existing and planned improvements to MD 140.
C. Growth-related Transportation Projects
State funding for transportation projects is provided in the CTP, which is prepared by MDOT and approved by the General Assembly. The CTP is a planning and budgetary document required under Annotated Code of Maryland, Transportation Article ("TR"), § 2-103.1. It lists, among other things, the capital projects for the current year, the budget request year, and the four successive planning years. TR, § 2-103.1(c). The CTP also identifies the phases for which a project is funded during each of the years comprising the CTP — those phases being Planning, Engineering, Right of Way, and Construction.
The definition of "growth-related project" in the Smart Growth legislation encompasses many of those projects. In particular, that term includes:
 any major capital project as defined in § 2-103.1(a)(4) of the Transportation Article, except existing transportation facilities projects as defined in § 4-101(I) of the Transportation Article, project planning as defined in § 8-610(g) of the Transportation Article, or initial project planning as defined in § 8-610(h) of the Transportation Article.
SFP, § 5-7B-01(d)(1)(I). Major capital transportation projects are defined in TR, § 2-103.1(a)(4), as follows:
 "Major capital project" means any new, expanded, or significantly improved facility or service that involves planning, environmental studies, design, right-of way, construction, or purchase of essential equipment related to the facility or service.
Excluded from the definition of "growth-related project" are existing transportation facilities projects[6] and project planning.[7]
MDOT's decision to remove the Manchester Bypass and the Westminster Bypass projects from the FY 1999 CTP was based, at least in part, on MDOT's conclusion that both projects are growth-related projects outside of a priority funding area.
Without doubt, the Manchester Bypass and the Westminster Bypass are major capital projects and, thus, are growth-related transportation projects for purposes of the Smart Growth law. Each project involves planning, environmental studies, design, right of way, and construction. In addition, both bypass projects, if constructed, would be located outside of a priority funding area. Therefore, the Smart Growth law's prohibition on funding would apply to both bypass projects.
D. Smart Growth Grandfather Provisions
As outlined above, the Smart Growth restrictions would not apply to a transportation project such as the Manchester Bypass or the Westminster Bypass if, with respect to that project:
 (a) approval has been granted or a commitment made before October 1, 1998;
(b) a valid permit has been issued;
 (c) a commitment for a grant, loan, loan guarantee, or insurance for a capital project has been granted;
 (d) final review under the National Environmental Policy Act or the Maryland Environmental Policy Act is completed by October 1, 1998; or
 (e) final review through the State Clearinghouse for Intergovernmental Assistance is completed by January 1, 1999.
Chapter 759, § 2, Laws of Maryland 1997. If either bypass falls within any of these five categories then the project would be grandfathered and unaffected by the Smart Growth funding restrictions.
Neither bypass project is covered by subsections (b), (c), (d), and (e). Only subsection (a) requires extended analysis. With respect to subsection (b), we are advised by the State Highway Administration ("SHA"), the MDOT modal administration responsible for both projects, that a valid permit has not been issued for either project. SHA also advises that neither project has received "a commitment for a grant, loan, loan guarantee, or insurance"; accordingly, subsection (c) does not apply.
Subsection (d) can be a potential basis for grandfathering a State highway project as such projects are subject to review under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, or the Maryland Environmental Policy Act (MEPA), Md. Ann. Code, Natural Resources Article, § 1-301 et seq.[8] The Manchester Bypass, however, has received neither NEPA nor MEPA approval, and no project engineering activities have begun. Nor has the remaining portion of the Westminster Bypass obtained such approval.[9] As a result, neither the Manchester Bypass nor Westminster Bypass is grandfathered under subsection (d).
Finally, the bypass projects are not within the ambit of State Clearinghouse for Intergovernmental Assistance. Accordingly, subsection (e) does not apply. Thus, subsections (b), (c), (d), and (e) do not provide a basis for exempting either bypass project from Smart Growth funding restrictions.
Subsection (a) of the grandfather provision exempts a project or program from Smart Growth funding restrictions if "approval has been granted or a commitment made before October 1, 1998." Although this broad language may cover a variety of circumstances for various types of projects or programs covered by the Smart Growth legislation, it is our view that the Legislature did not intend to grandfather transportation projects that were only at the project planning phase. In our opinion, in order to be grandfathered under subsection (a), a transportation project must have received a funding commitment or approval for design or construction prior to the cutoff date. Several reasons lead to this conclusion.
The planning phase of a transportation project often involves an evaluation of the need for the project and the cost and prerequisites for accomplishing the project. In many instances, it is the function of the planning phase to help determine whether the State should make a commitment to the project. In the absence of a commitment to future construction of the project as evidenced by the inclusion of construction funding in the "out years" of the CTP, the planning phase of a transportation project by itself does not constitute commitment or approval sufficient to grandfather a project.
Moreover, as discussed above, the Smart Growth legislation explicitly excludes from its purview planning activities related to transportation projects, even if the eventual funding of the construction of those projects would be barred by the Smart Growth legislation. SFP, § 5-7B-01(d)(1)(i). Presumably, this permits the State to make a more informed assessment of whether the project is barred by the Smart Growth statute, fits within a statutory exception, or is appropriate for a special exception by the Board of Public Works. But funding of the planning phase by itself does not signify the level of commitment or approval necessary to grandfather a project under subsection (a).[10]
The legislative history also supports the conclusion that transportation projects that were in the planning phase alone as of October 1, 1998, were not grandfathered. The companion bill to SB 389, HB 508, was amended by the House Environmental Matters Committee to include an additional grandfather provision for any project "for which an appropriation has been included by October 1, 1998 in the development and evaluation portion of the Consolidated Transportation Program." HB 508, § 2(f).[11]
This clause would have extended the grandfather provision to any projects in the CTP that were in the planning stage. This House amendment, along with all the amendments adopted by the House Environmental Matters Committee, was considered by the Conference Committee appointed for SB 389. Directly confronted with the question of extending the grandfather clause to all projects in the CTP, including those in the planning phase, the Conference Committee rejected the language in Section 2(f) of HB 508. Conference Committee Report, SB 389, page 1.[12] Both houses of the Legislature then passed Senate Bill 389 without the language rejected by the Conference Committee. 1997 House Journal of Proceedings, pp. 3170 and 3179; 1997 Senate Journal of Proceedings, pp. 3174 and 3183. The General Assembly's rejection of the extension of the grandfather provision to transportation projects in the planning phase further indicates that the commitments or approvals referenced in subsection (a) do not encompass simply commitments or approvals for highway projects in the planning stages.
Finally, on the day of the final passage of SB 389, Governor Glendening wrote to Delegate Kenneth Schisler and described the administration's understanding of the grandfather provisions:
 The question has arisen in the Smart Growth legislation of the impact that the so called "grandfathering" language in the conference committee report has on the programs and proposed funding in the Consolidated Transportation Program. It is the position of the Administration that projects for which construction funds have been provided in the 1997 CTP, including construction funds in the out-years of the CTP, have received a state "commitment," and thus would be grandfathered
and would not be subject to review under the provisions of the bill.
(Emphasis added.) This letter, part of the legislative file for SB 389, further indicates that the Legislature adopted a grandfather provision that was to be applicable to construction commitments in the CTP and not commitments to project planning alone.
Project planning is permitted without NEPA or MEPA approval and is permitted without regard to the Smart Growth funding restrictions. Thus, a commitment to perform project planning for a growth-related highway project outside a priority funding area would not grandfather the project because project planning is not precluded under the Smart Growth legislation. Also, the legislative history bears out that the "commitment or approval" provision in subsection (a), in the context of a transportation project, pertains to design and construction commitments and not to the planning phase alone. As neither bypass had advanced beyond the project planning phase as of October 1, 1998,[13]
neither project is grandfathered under subsection (a).
Accordingly, in our opinion, none of the grandfather provisions of the Smart Growth legislation apply to Westminster Bypass or Manchester Bypass.
E. Availability of Exceptions Process
As outlined above, the General Assembly recognized that, under certain circumstances, there may be a need to provide funding for a growth-related project that is not in a priority funding area. Accordingly, it provided a process for obtaining exceptions from the Board of Public Works.[14] The Board must find either that there are "extraordinary circumstances" that justify exempting the project from the Smart Growth restrictions. Alternatively, in the case of a transportation project, the Board can also grant an exception if it finds that the project satisfies the various criteria listed in the statute.
Section 5-7B-05-(b)(1) identifies who can seek an exception from the Board as follows:
 A request for approval by the Board under subsection (a) of this section may be made at the request of the governing body of the local jurisdiction in which the project is located or the Secretary with approval authority over the project.
Thus, under the plain reading of paragraph (b), either the governing body of the local jurisdiction in which the project is located or the Secretary of the State department in charge of the project, can seek Board approval of an exception from Smart Growth funding restrictions for a growth-related project that is not located within a priority funding area.
The amendments to SB 389 indicate that the Legislature specifically considered the issue of whether a local jurisdiction may seek an exception independent of the pertinent State agency. Originally SB 389, as well as its companion bill in the House, provided that either the local government or the Secretary with approval authority over the project may request an exception from the Board of Public Works. The Senate substituted the conjunction "and" for "or," suggesting that the assent of both the local jurisdiction and the State agency would be necessary to apply to the Board for an exception. Both the House and Senate bills were considered by the Conference Committee and the Senate amendment was rejected. Conference Committee Report, SB 389, Amendment No. 4.
The legislative history and the plain meaning of the statute thus both indicate that either the governing body of the local jurisdiction or the Secretary with approval authority over the project may seek approval of an exception by the Board of Public Works. Such an exception can be sought for any growth-related project that is not in a priority funding area under SFP, § 5-7B-05(a)(2), requiring a Board determination of "extraordinary circumstances." In addition, for a growth-related transportation project that is not located within a priority funding area, either the local jurisdiction in which the project is located or the Secretary of MDOT can seek an exception under § 5-7B-05(a)(3).[15]
With respect to the Manchester Bypass and the Westminster Bypass, either the Secretary of MDOT or the Carroll County Commissioners may seek approval from the Board of Public Works to remove the Smart Growth funding restrictions from one or both of these projects. The funding restriction may be eliminated if the applicant can demonstrate, to the satisfaction of the Board, that one of the exception criteria in § 5-7B-05(2) or (3) are met. The Board's approval does not fund the project but does allow the project to be funded in accordance with the State's budgetary procedures, without regard to Smart Growth funding restrictions.
 IV Conclusion
For the foregoing reasons, in our opinion, neither the Manchester Bypass nor the Westminster Bypass is exempt from the Smart Growth funding restrictions as a result of the grandfather provisions of the Smart Growth legislation. The Carroll County Commissioners or the Secretary of MDOT may seek approval from the Board of Public Works to remove the Smart Growth funding restrictions from either bypass project. However, the approval of an exception in and of itself would not result in State funding for either project.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Edward R. K. Hargadon Assistant Attorney General
 Edward S. Harris Assistant Attorney General
___________________________ Robert N. McDonald Chief Counsel Opinions and Advice
[1] Because the Smart Growth funding restrictions are statutory rather than constitutional in nature, they are also subject to subsequent legislation. Mayor and City Council of Baltimore v.State, 281 Md. 217, 228-29, 378 A.2d 1326 (1977).
[2] This grandfather provision is not codified but is included in the Annotated Code of Maryland as an editor's note following SFP, § 5-7B-01.
[3] In particular, SFP, § 5-7B-06(a)(1)-(3) lists the following exceptions:
(1) A project that is required to protect public health or safety;
(2) A project involving federal funds, to the extent compliance with this subtitle would conflict or be inconsistent with federal law; or
(3) A growth-related project related to a commercial or industrial activity which, due to its operational or physical characteristics, shall be located away from other development, including:
(i) a natural resource based industry;
(ii) an industry relating to:
1. agricultural operations, as defined in § 7-101
of the Labor and Employment Article;
2. forestry activities; or
3. mineral extraction;
(iii) an industry that is proximate to:
1. an airport facility;
2. a port facility;
3. a railroad facility
4. a transit facility; or
5. a major highway interchange; or
(iv) a tourism facility or museum that is required to be located away from other development due to necessary proximity to specific historic, natural, or cultural resources.
[4] Presumably, the "extraordinary circumstances" exception ordinarily establishes a higher threshold for an exception than these criteria. Otherwise, the "transportation project" exception would be unnecessary.
[5] These improvements to MD 140 are within the priority funding area surrounding Westminster and thus not prohibited by the Smart Growth legislation.
[6] "Transportation facilities" are facilities of the Maryland Transportation Authority not relevant to this opinion.
[7] TR, § 8-610(g) provides:
 "Project planning phase" means the phase in which engineering and environmental studies and analyses are conducted with full participation of the public, in addition to local, State, and federal agencies, to determine the scope and location of a proposed highway project.
[8] NEPA and MEPA establish procedures for environmental review, including public involvement, for projects such as the bypass projects. If a highway project utilizes federal funds or otherwise involves some federal action, NEPA requirements must be met. Any project utilizing State funds must comply with MEPA. The result is that a review under one or both of these environmental statutes is conducted for any growth-related highway project.
Before they were removed from the FY 1999 CTP, both the Manchester Bypass and the Westminster Bypass had been proceeding through SHA's project planning process, consistent with NEPA. Generally, when a NEPA project has progressed beyond project planning into project engineering and construction, the project has received NEPA approval. In fact, the federal regulations implementing NEPA for highway projects place significant limitations on the design activities that may proceed without final NEPA review. See 23 C.F.R. § 771.113.
[9] A separate NEPA approval was obtained to construct the improvements to the existing MD 140 which began as part of the Westminster Bypass that was ultimately constructed separately.
[10] Similarly, MDOT can proceed with the planning phase of a project in the absence of final review under NEPA or MEPA. In fact, the environmental review under NEPA and MEPA is conducted during the project planning phase and must be completed before the project proceeds to design or construction. The Smart Growth legislation makes the same distinction. The legislation specifically excludes the project planning phase from the definition of a growth-related transportation project. Thus, the requirements are parallel.
[11] "Development Evaluation" includes "projects for planning studies, preparation of environmental studies and preliminary design." CTP Glossary of Terms.
[12] The proposed amendment to create a "§ 2(f)" in the grandfather provision of House Bill 508 is listed as House Environmental Matters Committee Amendment No. 14 in the Conference Committee Report.
[13] SHA advises that, from FY 1989 through FY 1997, $132,786 in engineering costs were expended on the Westminster Bypass. These engineering costs were not incurred in connection with the proposed bypass but were spent on the design of improvements to existing MD 140.
[14] Neither bypass is exempt from the funding prohibition under any of the statutory exceptions in SFP, § 5-7B-06(a). While both projects would receive federal funds if they went forward application of the Smart Growth legislation is not in conflict with or inconsistent with federal law. See
SFP, § 5-7B-06(a)(3).
[15] While a local jurisdiction may seek an exemption from the Board, the Office of Planning and the Department of Transportation may adopt procedures to assist in the processing of requests to the Board. Indeed, in Executive Order 01.01.1995.04, the Governor directed the Department of Transportation and the Office of Planning to develop procedures for the Board considering transportation projects under § 5-75-05. Executive Order No. 01.01.1998.04E.(6). Last fall, a committee established by that Order the Smart Growth and Neighborhood Conservation Coordinating Committee, developed a manual of implementation procedures for state agencies.
 *Page 50