Dear The Honorable William Donald Schaefer
You have requested our opinion on various questions related to an uncodified section of the 1998 capital budget bill that authorizes the Maryland Stadium Authority to perform construction and related work for other State agencies and local governments. Those questions may be summarized as follows:
1. Is the language in the 1998 capital budget bill sufficient to give the Stadium Authority continuing authority to design and construct facilities for State agencies and local governments?
2. Must the Stadium Authority obtain the approval of the Board of Public Works ("the Board") before it undertakes a project on behalf of another State agency or a local government, if that project will use State funds?
3. Has the General Assembly "inadvertently usurped the prerogatives of the Executive Branch" in the 1998 legislation by assigning approval authority to standing legislative committees with respect to the design and construction of capital projects by the Stadium Authority?
4. May the Board prevent the Stadium Authority from entering into a contract "even if the two legislative budget committees have given their affirmative approval" to the contract?
For the reasons set forth in this opinion, we conclude:
1. The 1998 legislation validly grants the Stadium Authority continuing authorization to enter into agreements to perform construction and related work for State agencies or local governments. However, to comply with directory language in the State Constitution, the Legislature should codify such authority as part of the Stadium Authority's enabling act in the Annotated Code of Maryland.
2. Neither the 1998 legislation, the Stadium Authority's enabling act, nor the State procurement law requires the Stadium Authority to obtain Board approval before entering into an agreement to perform construction or related work for another State agency or local government. In the context of a particular agreement, the other agency may be obliged to obtain the Board's approval.
3. Because the 1998 legislation affords the legislative budget committees only advance notice and an opportunity to comment on the Stadium Authority's proposed agreements and does not purport to grant the committees approval authority, that legislation does not offend the constitutional separation of powers.
4. If Board approval is required for a particular contract, the Board has discretion to reject that contract, regardless of whether the legislative committees have commented favorably on the proposed agreement.
 I Background
The structure, purpose, and basic powers of the Stadium Authority are found in its enabling legislation, the Maryland Stadium Authority Act ("the Act"). Annotated Code of Maryland, Financial Institutions Article ("FI"), § 13-701 et seq. Your questions concern additional powers and responsibilities that the Legislature has given to the Stadium Authority in uncodified language in the 1998 capital budget bill that has not been incorporated in the Act.
A. Maryland Stadium Authority Act
In 1986, the General Assembly established the Stadium Authority as "an instrumentality of the State and a public corporation." Chapter 283, Laws of Maryland 1986; FI § 13-702(b). It is an independent unit within the Executive Branch of State government. FI § 13-702(c). Under its enabling act, the Stadium Authority has broad powers to design, construct, and operate sports stadiums, convention centers, a performing arts center, and related properties. The Legislature has characterized the Stadium Authority's exercise of its statutory powers as "an essential public function." FI § 13-702(d).
The Governor appoints six of the seven members of the Stadium Authority and selects its chairman; the seventh member of the Stadium Authority is appointed by the Mayor of Baltimore City. FI § 13-703. A member may be removed by the Governor (or, in the case of the seventh member, by the Mayor) for incompetence, misconduct, or a failure to perform official duties. Id. The chief administrative officer of the agency is its executive director, who serves at the pleasure of the Stadium Authority, with the concurrence of the Governor. FI § 13-705.
The Act enumerates specific powers of the Stadium Authority — for example, it may employ, as needed, engineers, architects, consultants, and other professionals; it may enter into contracts "of any kind;" and it may set rates and rents for its facilities and services. FI § 13-708(a)(5), (6), (10). In addition, it may exercise all powers granted to Maryland corporations under the general corporation law. FI § 13-708(a)(16). The Stadium Authority is generally exempt from the State procurement law, except for provisions relating to participation by minority business enterprises. See Annotated Code of Maryland, State Finance Procurement Article ("SFP"), § 11-203(c); FI § 13-718(2).
Although the Stadium Authority is not subject to oversight by the Board of Public Works under the procurement law, the General Assembly has conditioned the exercise of some of the Authority's key powers on Board approval. For example, Board approval is a prerequisite for the Stadium Authority to enter into contracts for the acquisition or construction of a sports facility, convention center, or performing arts center, FI § 13-709(a); to acquire an ownership interest in a professional sports franchise, FI § 13-710; to exercise condemnation powers, FI § 13-711(b)-(c); to acquire property from the State or local governments or to enter into a lease agreement with the State, FI § 13-711(d); to issue bonds to finance its activities, FI § 13-712; to borrow money and encumber its assets, FI § 13- 708(13); and to receive gifts, grants, and other contributions and to invest the proceeds, FI § 13-708(15). Board approval is also required to transfer State funds from a special fund to the Stadium Authority to finance capital construction or for other corporate purposes. SFP § 7-312(e).
The Act does not specifically authorize the Stadium Authority to perform work on behalf of other governmental units, except in connection with the specific facilities and projects described in the Act. In 1998, however, in separate legislation, the General Assembly authorized the Stadium Authority generally to perform work for other agencies under certain conditions.
B. 1998 Capital Budget Bill
As part of the 1998 capital budget bill, the Legislature authorized the Stadium Authority to enter into agreements with other State agencies and local governments to construct facilities and perform related work. The provision made clear that the Stadium Authority is not responsible for financing such work. Commencement of work under such an agreement is contingent on notice to the Legislature's budget committees with an opportunity for the committees to review and comment on the agreement. In particular, that legislation provided:
 The Maryland Stadium Authority is authorized to prepare various studies, including site studies, architectural programs, budget estimates, value engineering, and project schedules, and may design and construct facilities for State agencies or local governments, provided that prior to beginning work on behalf of a State agency or local government, the Authority must notify the budget committees in writing of the proposed project and allow the committees 30 days to review and comment on the proposed work. The Authority is permitted to enter into contracts, engage consultants, and make recommendations relating to this purpose and shall use funds provided by the State agencies or local governments or otherwise appropriated for the particular purpose.
Chapter 138, § 12, Laws of Maryland 1998 (emphasis added). That authorization remains uncodified in the 1998 session laws.[1]
 II Analysis A. Continuing Effect of Uncodified Section of Capital Budget Bill
You ask whether the uncodified language in the 1998 capital budget bill suffices to give the Stadium Authority continuing
authority to perform construction and related work for other State agencies and local governments. We understand your concern to be whether the failure to codify this authorization in the Stadium Authority's enabling act limits its duration.[2]
Article III, § 29, of the State Constitution states, in pertinent part:
. . .whenever the General Assembly shall enact any Public General Law, not amendatory of any section, or article in the said Code, it shall be the duty of the General Assembly to enact the same, in articles and sections, in the same manner, as the Code is arranged, and to provide for the publication of all additions and alterations, which may be made to the said Code.
Under this provision, which has long been part of the State Constitution, public general laws are to be enacted as part of the Annotated Code of Maryland. The Court of Appeals has described the purpose of this requirement:
 The laws having been codified under former enactments, the Constitution contemplates the continuance of the system, and to save time, labor and expense, the duty is imposed upon the Legislature, in amending existing laws, or enacting public general laws, to observe certain forms, to adapt them to the Code arrangement.
Hardesty v. Taft, 23 Md. 512, 1865 WL 1963 at *8 (1865). However, it has also long been understood that this provision is directory rather than mandatory. Id. ("compliance with this provision [is] not essential to the validity of a public general law"). See alsoCounty Commissioners v. Meekins, 50 Md. 28, 44-45, 1878 WL 4717 at *9 (1878) ("while. . .the Legislature may have failed to discharge the duty imposed upon it, the Acts themselves are valid"); 76Opinions of the Attorney General 377, 378 (1991).
Thus, § 12 of the 1998 capital budget bill is a valid grant of authority to the Stadium Authority to perform construction and other work for governmental agencies, despite the General Assembly's failure to codify that authorization in the Annotated Code of Maryland. Unlike the appropriations for a particular fiscal year in the annual budget bill, the provisions of a capital budget bill, like other laws passed by the General Assembly, are not necessarily limited to a single year. Section 12 itself contains no sunset provision or other time limitation and thus remains effective. However, we recommend that the Legislature, consistent with the constitutional directive, codify this authority as part of the Maryland Stadium Authority Act.
You also express concern that the powers § 12 confers on the Stadium Authority may duplicate those already assigned to the Department of General Services ("DGS"). For example, many State agencies are required to obtain approval or submit to reviews by DGS in connection with the design and construction of projects.See, e.g., SFP § 4-406(a), (c), (e) (supervision and approval by DGS of engineering questions, appraisals, and plans and specifications related to public improvements); SFP § 4-704
(consultation with State Board of Architectural Review required with respect to construction of State building).
As DGS is itself a creature of statute,[3] it is a policy decision for the Legislature whether to add to, or subtract from, the functions of DGS, or to assign similar functions to another agency. There is no explicit indication in § 12 that the Legislature intended to eliminate DGS' role when an agency enlists the assistance of the Stadium Authority under § 12. Moreover, repeals by implication are disfavored. Farmers MerchantsNational Bank v. Schlossberg, 306 Md. 48, 61, 507 A.2d 172 (1986). It is conceivable that the General Assembly wished to permit other agencies to take advantage of expertise developed within the Stadium Authority while retaining oversight by DGS.[4] We express no opinion on the wisdom of the Legislature's policy decision to allocate possibly duplicative responsibilities to the Stadium Authority; rather, we conclude that it is within the Legislature's constitutional powers to give the Stadium Authority the responsibilities described in § 12.
B. Approval of the Board of Public Works
Under the State Constitution, the Board's approval authority over the contracts of State agencies derives from statutory grants of authority by the General Assembly. See Maryland Constitution, Article XII, § 1; A. Wilner, The Maryland Board of Public Works: AHistory (1984) at pp. 79-80, 90; 76 Opinions of the AttorneyGeneral 46, 49 n. 3 (1991). Whether the Stadium Authority must obtain Board approval before it undertakes a project on behalf of another agency thus depends upon whether such a prerequisite can be traced to an applicable statute.
 1. Statutory Provisions Regarding Board Approval
The General Assembly has largely exempted the Stadium Authority from the State procurement law and from any requirement to obtain Board approval of its contracts under that law. However, as you correctly note in your letter, under its enabling act the Stadium Authority must obtain the Board's approval of contracts for "the acquisition of any facility site or the construction of the facility or facility site." FI § 13-708(a). This requirement does not embrace all contracts of the Stadium Authority, but only acquisition or construction contracts relating to a "facility." The term "facility" is specifically defined in the Act to mean sports facilities[5], other facilities at Camden Yards, the convention centers in Baltimore City and Ocean City, the Montgomery County Conference Center, the Hippodrome Performing Arts Center, and related properties. FI § 13-701(i).
The General Assembly did not include in § 12 of the 1998 capital budget bill any requirement that the Stadium Authority obtain the approval of the Board before exercising its authority under that provision to enter into agreements with other State and local agencies to perform studies or construction work. Although the word "facility" appears in § 12, the term is not specifically defined in that section. Nor is there any cross-reference to the specific definition of "facility" in the Stadium Authority's enabling act.
We do not believe that the Legislature meant to incorporate without cross-reference the specialized meaning of the term "facility" in the Act and, consequently, the requirement for Board approval of construction and acquisition contracts. To import the definition of "facility" from the Act into § 12 of the 1998 capital budget bill would limit the Stadium Authority's powers under that section to those already conferred by the Act and render § 12 superfluous — a construction disfavored by the courts. See,e.g., Giant Food, Inc. v. Department of Labor, Licensing andRegulation, 356 Md. 180, 194, 738 A.2d 856 (1999) (statutes should be read so as not to render them superfluous). Moreover, the legislative committee reports on the 1998 capital budget bill each characterize § 12 as generally authorizing the Stadium Authority to "perform work on behalf of State agencies and local governments." Report of House Appropriations Committee concerning Senate Bill 217 at p. 22; Report of Senate Budget and Taxation Committee concerning Senate Bill 217 at p. 16. In the context of § 12, "facility" has its common meaning: "something created to serve a particular function." Webster's II, New Riverside University Dictionary (1988) at p. 460. Accordingly, in our opinion, the use of the term "facility" in § 12 was not intended to incorporate a requirement of Board approval from the Act.
There is thus no general statutory requirement that the Stadium Authority obtain the Board's approval before proceeding with an agreement to perform work on behalf of another agency. This does not mean that the agreement or related contracts will not come before the Board. The agency that employs the Stadium Authority may itself be obligated to obtain Board approval. For example, that agency may be subject to the State procurement law in whole or in part. While agreements between units of the State are generally exempt from the procurement law, there are exceptions to that exemption. SFP § 11-203(a)(2). One of those exceptions pertains to capital expenditures. SFP § 11-203(b)(1)(iii); SFP § 12-201 et seq. As a result, contracts for capital expenditures by such agencies will be subject to Board approval even though the agency has enlisted another governmental unit — i.e., the Stadium Authority — to design or construct the project.
 2. Board Regulation
You also ask whether the Board itself may require the Stadium Authority to submit any proposed agreements to perform work on behalf of other State agencies or local governments to the Board.
The Legislature has authorized the Board to promulgate regulations to "require that any proposed contract, contract renewal, or change order, of a designated class or monetary value, of any unit of the Executive Branch be brought to the Board for consideration and approval before execution." SFP § 10-204; seealso ARA Health Services, Inc. v. Department of Public Safety andCorrectional Services, 344 Md. 85, 94, 685 A.2d 435 (1996). The Stadium Authority is a unit of the Executive Branch. FI § 13-702(c). While the Stadium Authority is exempt from Division II of the State Finance Procurement Article, SFP § 10- 204 is part of Division I of that article. Thus, by its literal terms, this statute appears to authorize the Board to issue a regulation requiring the Stadium Authority to submit its contracts for approval.
Despite the inclusive language of SFP § 10-204, examination of the origin and history of this provision casts doubt on whether the General Assembly intended to authorize the Board to issue a regulation requiring its approval of Stadium Authority contracts. As the following chronology indicates, the statute has been known by five different names and appeared at various times in each of the three divisions of the State Finance Procurement Article during the past two decades. At various junctures, the Legislature has indicated an intent that Stadium Authority contracts be exempt from the Board's authority to issue regulations requiring its approval of agency contracts.
The original predecessor of SFP § 10-204 was enacted in 1978 and codified as former Article 78A, § 68. See Chapter 221, Laws of Maryland 1978. It provided that:
 The Board of Public Works may require. . .by regulation that any contract. . .of any State department, board, commission, institution, or other agency of the executive branch, be brought before the Board. . .for consideration and approval. . . The provisions of this section are in addition to and not in lieu of other powers and authorities granted the Board. . .
In 1985 the statute was recodified as SFP § 21-101 in a new Division III of the State Finance Procurement Article. Chapter 586, § 2, Laws of Maryland 1985. At that time, it clearly applied to all units of the Executive Branch; the Stadium Authority did not yet exist.
When the Stadium Authority was created in 1986, its enabling legislation exempted it from Division II of the State Finance 
Procurement Article (the State procurement law), but not from Division III of that article. Chapter 283, Laws of Maryland 1986. However, during the same session, the Legislature undertook a reorganization of the State Finance Procurement Article to become effective July 1, 1987. Chapter 840, Laws of Maryland 1986. As part of that reorganization, Division III was eliminated and the statute authorizing the Board to issue regulations concerning contract approval, along with most provisions in Division III, was transferred to Division II and recodified as SFP § 11-202.[6] Because the Stadium Authority was already exempt from Division II, that statute would no longer pertain to the Stadium Authority as of July 1, 1987.
During the next legislative session in 1987, the General Assembly amended the Stadium Authority's Act to exempt it from Division III as well as Division II, even though Division III was facing an imminent demise as a result of the 1986 reorganization of the SFP Article. Chapter 123, Laws of Maryland 1987. That legislation was part of a package of administration bills related to the financing and construction of sports facilities. Collectively, that legislation also included requirements that the Stadium Authority obtain Board approval for various specified activities. See Kelly v. Marylanders for Sports Sanity, 310 Md. 437,441-46, 530 A.2d 245 (1987) (summarizing 1987 legislation).
As the portion of the 1987 legislation concerning the Stadium Authority's exemption from portions of the State Finance 
Procurement Article became effective June 1, 1987, it had the effect of exempting the Stadium Authority from the Division III provisions, including SFP § 21-101, one month earlier than under the 1986 legislation that became effective July 1, 1987. While it thus had a limited effect in practice, this amendment demonstrates a legislative intent at that time to exempt the Stadium Authority not only from the State procurement law, but also from the Board's authority to issue regulations regarding contract approval.
In 1988, the Legislature undertook yet another revision of the procurement law and recodified the provision concerning Board regulations as SFP § 12-109, which remained in Division II. Chapter 48, § 2, Laws of Maryland 1988. A technical amendment also eliminated the Stadium Authority's exemption from the now-abolished Division III. Chapter 49, Laws of Maryland 1988. Thus, the Stadium Authority remained exempt from the Board's authority to require approval by regulation by virtue of its exemption from Division II of the State Finance Procurement Article.
Finally, in 1989, the Legislature again revisited the provision authorizing the Board issue regulations to require its approval of agency contracts. The Legislature transferred the provision from Division II of the State Finance Procurement Article to its current location in Division I of that article and recodified it under its current moniker — SFP § 10-204. Chapter 101, Laws of Maryland 1989. No change was made to the Stadium Authority's exemption from Division II. It is this legislation that apparently subjects the Stadium Authority to a Board regulation concerning contract approval.
The title of the 1989 legislation states that it "clarif[ies] the Board of Public Works' authority to approve State contracts independent of the Procurement Law." Chapter 101, Laws of Maryland 1989. Materials in the legislative file indicate that the purpose of the bill was to "eliminate any ambiguity as to the extent of [the Board's] authority to review contracts. . ." and to clarify that "the Board may review contracts that are exempted from Division II of the procurement law, which was the intent and practice prior to the 1985 code revision." Floor Report for Senate Bill 116 (1989). There is no mention of the Stadium Authority or its prior exemption from Division III in the file. Testimony by a staff member of the Board indicated that the purpose of the 1989 legislation was to undo the effect of the transfer of the statute from Division III to Division II, which had inadvertently limited its reach to contracts subject to the procurement law. Testimony submitted by Board of Public Works on Senate Bill 116 (March 28, 1989).
However, the Stadium Authority was exempt from the predecessors of SFP § 10-204, not just because it was exempt from the procurement law, but also because it was exempt, however briefly, from Division III prior to the elimination of that division. It is possible that the Legislature exempted the Stadium Authority from Division III as well as Division II because it believed that the detailed control mechanisms in the Stadium Authority's enabling act — including numerous required approvals by the Board — obviated any need to make the Stadium Authority subject to those provisions. In the absence of evidence that the General Assembly intended to reverse its prior policy decision about the Stadium Authority, and to the extent that the 1989 legislation was simply designed to undo an unintended effect of the 1986 revision of the State Finance Procurement Article and not to expand the Board's power to issue regulations, one may question whether a literal construction of SFP § 10-204, which would permit the Board to issue regulations concerning contracts of the Stadium Authority, carries out the actual legislative objective.
In the course of codifying the authority granted in § 12 of the 1998 capital budget bill, the Legislature could, and should, also clarify its intent about the Board's power to issue regulations concerning the Stadium Authority contracts. Given the uncertainty as to whether SFP § 10-204 was intended to authorize the Board to require its approval of Stadium Authority contracts, we recommend that the Board refrain from issuing a regulation under that statute with respect to the Stadium Authority until the Legislature has had an opportunity to clarify the issue.
 C. Effect of Legislative Review and Comment on Stadium Authority Agreements
 1. Whether Legislative Committees Have "Approval" Authority
With apparent reference to the uncodified language in the 1998 capital budget, you ask whether the General Assembly has "inadvertently usurped the prerogatives of the Executive Branch and its executive agencies to administratively direct the design and construction of capital projects by assigning oversight and approval authority to two of its standing committees."
As an initial matter, we note that § 12 of the 1998 capital budget bill does not give the legislative committees authority to oversee or "approve" agreements between the Stadium Authority and other agencies. Rather, before beginning any work, the Stadium Authority must notify the budget committees of an agreement and allow the committees 30 days to review and comment on that agreement. While the Stadium Authority may wish to avoid legislative displeasure or may find a committee comment persuasive in a particular instance, it is under no legal obligation to comply with those comments. Thus, the budget committees have authority to review and comment, but no authority to approve or disapprove a project.
The distinction is critical. A provision that rendered the Stadium Authority's individual agreements subject to legislative approval would establish a legislative veto over executive action. Although this Office once concluded that a statute reserving to a legislative committee a veto over proposed regulations was not clearly unconstitutional, 63 Opinions of the Attorney General 125, 127-28 and 150-51 (1978), there was little judicial authority on the subject at that time. Subsequently, most state courts that have considered the issue have held that legislative veto provisions violate the separation of powers provisions of their respective state constitutions. See generally Rossi,Institutional Design and the Lingering Legacy of Anti-FederalistSeparation of Powers Ideals in the States, 52 Vand. L.Rev. 1167, 1201-04 nn. 186-90 (1999) (collecting cases and noting that, with one exception, legislative vetoes have been found unconstitutional by every state court to consider the question). Similarly, the United States Supreme Court has held that a provision giving Congress a legislative veto violated the federal constitution. INS v. Chadha, 462 U.S. 919 (1983).
Although the Court of Appeals of Maryland has not yet considered the issue, during the past decade this Office has repeatedly noted the questionable constitutionality of legislative veto provisions in light of the overwhelming weight of authority in other jurisdictions. See, e.g., 75 Opinions of the AttorneyGeneral 431, 437 n. 6 (1990); Bill Review Letter of Attorney General to Governor on Senate Bill 302 (April 24, 1998) (citing prior letters and case law on legislative veto).
A provision that obligates an agency to report its activities to the Legislature in advance, to permit an opportunity for legislative review and comment, does not authorize a legislative veto. It is well within the Legislature's prerogatives to require executive agencies to inform its committees of agency activities. Indeed, such fact-gathering may be essential to the legislative process. Nor does an opportunity for legislative comment offend the constitutional separation of powers. While an agency may deem it politically advisable to comply with the expressed wishes of a legislative committee or may find the committee's comments persuasive on their merits, the agency is under no legal obligation to comply with a legislative comment that is not embodied in statute. Thus, in our opinion, a provision for legislative review and comment does not suffer the same constitutional infirmity as one that authorizes a legislative veto.
 2. Effect of Legislative Review on Board's Approval Authority
Finally, you ask whether the Board could disapprove a Stadium Authority contract even if it had been "approved" by the legislative budget committees. The opportunity for legislative review and comment prior to the Stadium Authority's entry into an agreement with another agency has no legal effect on any authority of the Board to approve or disapprove a Stadium Authority contract. Thus, if Board approval is required for a particular contract, the Board may appropriately consider any comments made by the legislative committees in exercising its own authority, but is not bound in any way by those comments. See 76 Opinions of theAttorney General 46, 51-53 (1991).
 III Conclusion
In summary, it is our opinion that:
1. The 1998 legislation validly grants the Stadium Authority continuing authorization to enter into agreements to perform construction and related work for State agencies or local governments. However, to comply with directory language in the State Constitution, the Legislature should codify such authority as part of the Stadium Authority's enabling act in the Annotated Code of Maryland.
2. Neither the 1998 legislation, the Stadium Authority's enabling act, nor the State procurement law requires the Stadium Authority to obtain Board approval before entering into an agreement to perform construction or related work for another State agency or local government. In the context of a particular agreement, the other agency may be obliged to obtain the Board's approval.
3. Because the 1998 legislation affords the legislative budget committees only advance notice and an opportunity to comment on the Stadium Authority's proposed agreements and does not purport to grant the committees approval authority, that legislation does not offend the constitutional separation of powers.
4. If Board approval is required for a particular contract, the Board has discretion to reject that contract, regardless of whether the legislative committees have commented favorably on the proposed agreement.
 J. Joseph Curran, Jr. Attorney General
 Robert N. McDonald Chief Counsel Opinions Advice
[1] As you note in your letter, during its most recent session the General Assembly also assigned the Stadium Authority certain oversight and consultative functions in connection with a State program to improve horse racing facilities in Maryland. See
Racing Act of 2000, Chapter 309, Laws of Maryland 2000. That legislation does not affect the powers granted to the Stadium Authority under the 1998 capital budget bill and, accordingly, does not affect the answers to your questions.
[2] Because the capital budget bill is a supplementary appropriation bill, subject to gubernatorial veto, the placement of this authorization in that bill is not an invalid attempt to "legislate in the budget." See Mayor and City Council ofBaltimore v. State, 281 Md. 217, 227-29, 378 A.2d 1326 (1977). Moreover, because § 12 relates to capital construction projects, its inclusion in the capital budget bill would not appear to offend the one-subject rule in Article III, § 29, of the State Constitution. Indeed, the bill contemplates that the Stadium Authority will manage at least one of the capital projects funded in the bill. Chapter 138, § 1, Item RB22(F), Laws of Maryland 1998. In any event, codification of § 12 as part of the Stadium Authority's enabling act, as recommended in this opinion, would resolve any issue under the one-subject rule. See 73 Am. Jur. 2dStatutes § 119.
[3] See Annotated Code of Maryland, State Government Article, § 8-201(b)(6); SFP § 4-201 et seq.
[4] Similarly, local government agencies with which the Stadium Authority contracts under the authority of § 12 may be subject to various local controls. In codifying § 12 as part of the Stadium Authority's enabling act, as recommended in this opinion, the Legislature may wish to address the relationship between the authority granted the Stadium Authority in § 12 and such local controls.
[5] The statute defines "sports facility" to mean:
 (1) Stadiums for the primary purpose of holding professional football games, major league professional baseball games, or both, in the Baltimore metropolitan area, as defined under Regional Planning Council Law;
 (2) Practice fields, or other areas where professional football or major league professional baseball teams may practice or perform;
 (3) Offices for professional football and major league professional baseball teams or franchises; and
 (4) Adjacent properties directly related to an item listed in paragraphs (1) through (3) of this subsection, including:
(i) Parking lots;
(ii) Garages; and
(iii) Other properties.
FI § 13-701(c).
[6] One subtitle of Division III was repealed. The other subtitles were reorganized and transferred to various provisions of Division II. Those provisions were again recodified in subsequent reorganizations of the State Finance Procurement Article, but most remained in Division II. In addition to the current SFP § 10-204, one other provision of former Division III was ultimately moved to Division I. In particular, a portion of former SFP § 21-501, relating to Board approval of State agency acquisitions of land, was initially transferred to Division II and codified in former SFP § 11-206, but later transferred to Division I and codified in its current guise as SFP § 4-415. Chapter 840, Laws of Maryland 1986; Chapters 48, 49, Laws of Maryland 1988.
 *Page 206